# WILSON vs. MORAN.

*In the matter of proving the last Will and Testament of*
SARAH SMITH, *deceased.*

A WILL made in favor of the professional advisers of the decedent and resisted
on the ground of undue influence and incapacity, admitted to probate, there
being no doubt as to the testamentary competency of the decedent, and no
traces of fraud, circumvention, or the exercise of influence incident to the con-
fidential relation which existed between the parties.

The mere knowledge on the part of beneficiaries occupying confidential or fidu-
ciary relations that a favorable will was to be executed, is not sufficient of
itself to invalidate the act, provided it be shown that the provisions of the
instrument accorded with the intentions of the decedent otherwise expressed.

A will by a client in favor of an attorney is not absolutely invalid. The existence
of that fiduciary relation does not annul the act, but still the circumstances
call for unusual circumspection and vigilance to see that it was in conso-
nance with the views and wishes of the testator, and was not the result of in-
fluence. There should be very clear evidence of mental capacity and satis-
factory proof independently of the mere *factum* that the mind, free and un-
biased, accompanied the act. This is a well-established rule of evidence,
compelling the proponent, even after the formal execution is established, to
show by other circumstances spontaneousness and volition.

In cases of alleged undue influence, although the absence of the party to be bene-
fited at the time of the execution, is an important portion of the proof, in
support of the instrument, yet it is not conclusive. The probability of the
will being the free act of the testator is sustained also by testimony as to
his testamentary wishes orally expressed at other periods and to other parties.
An opportunity to revoke the instrument, and the lapse of time since its ex-
ecution without an attempt at revocation, are material circumstances tending
to show it was not procured, but was truly the testator's will.

> WILLIAM FULLERTON,
> BENJ. V. DUNNING,
> S. D. VAN SCHAICK, *for Contestants.*

> P. G. CLARK, *for Proponents.*

It is not claimed but that all the forms prescribed by sta-
tute have been complied with in the execution of this will.
It is opposed, however, on the grounds that the testatrix was

not of sufficient mental capacity to make a valid disposition of her property by will, and that this will was procured by fraud and undue influence.

I. Upon the question of capacity, there does not seem to be a reasonable doubt. The will was executed on the 2nd day of November, 1848. The subscribing witnesses, who were the only persons present at the time of execution, declare her competency unqualifiedly. There is nothing in the whole case inconsistent with their testimony—nothing to shake our confidence in its entire credibility. To determine the question of capacity, reference is to be had to the state of mind at the time of the *factum*, and the state of the testatrix's mind before or after is unimportant, except as it tends to show the condition of her mind at the time of execution.

No witness ventures an opinion, or states a fact that tends to prove that the testatrix was not of sufficient capacity before, at the time of, or for some years after the execution of this will. On the contrary, the testimony of all the witnesses shows most satisfactorily, that the deceased was, down to a period subsequent to the making of this will, shrewd, intelligent, and in all respects competent to make a last will and testament. Thus Mr. Flanagan says, that at the time of execution, "she was of sound mind, memory, and understanding." Mr. Tappan says, "she understood herself very well; her mind was apparently clear."

This is the testimony as to her mind at the time of the *factum*. These witnesses were not strangers to her, but had known her for some years. Mr. Tappan, in speaking of her generally, says: "She was a strong-minded woman, very strong prejudices, and strong feelings generally. She was very competent to take care of her business, and to manage her affairs." Mr. Wetmore says, he "was acquainted with her for several years, and saw her, and had negotiations with her. I found her quite an intelligent woman for her position in life; she understood her matters which she had with me, as well as any person I ever met with. She was a woman of

decided character." Mr. Swain says, "I should never doubt her capacity; she was a very active and determined woman. She was a very close person to make a bargain with, and appeared to understand matters of business very well." Mr. Cummings says, "She was a remarkably shrewd, intelligent, business-like woman." There is nothing in the testimony produced by the heirs or next of kin, that tends to overthrow this evidence. The testimony of Mr. Radford shows, perhaps, that previous to her death she was of unsound mind, but he does not intend to say that she was so prior to the making of the contract with him in 1852, some four years after the execution of this will. The only other circumstance or fact stated, is the offer to sell her house for $800, when it was worth more. When this occurred does not distinctly appear. If the witness is right in his estimate of time, there is some palpable mistake. He says, this offer was made to his father some *five or six years ago.* Now, this is the same property sold to Radford, and he says: "I had been talking with her several years in relation to the purchase of property she occupied in Jay Street; she asked $4,500, the price agreed upon; the negotiation commenced *five or six years ago.*" So, according to one witness, she is offering the property for $800, and according to the other, she is about selling it for $4,500, and they fix it at the same time. The fact is of too trifling a character to spend time upon it—if considered of any importance, why was not the father of the witness produced to corroborate the witness? He states that the offer was made to his father, and on his cross-examination does not appear to be very clear as to what the offer was, except that he heard something about $800.

II. Upon the question of fraud and undue influence, there is no affirmative proof whatever. Fraud is never presumed. It must be proved. It is charged that the Messrs. Wilsons, the legatees, had induced the testatrix to make this will in their favor by fraud, and the exercise of an undue control or influence over her actions. This is a grave charge made

against gentlemen of respectable character and standing, and should be supported by clear and satisfactory proof, or unhesitatingly abandoned.

No witness has proved that the Messrs. Wilson had any influence over her, or that they ever attempted to exercise any for their benefit. The case on the part of the contestants rests upon the legal inference to be drawn from the confidential relations existing between the deceased and the Messrs. Wilson. It was the relation of counsel and client. They are sole legatees, to the exclusion of the next of kin of the deceased.

·By our law, a person may give his property by will to whom he pleases, to one of several heirs to the exclusion of the others, or to a stranger to the entire exclusion of his relatives; and if he be *compos mentis*, in the legal signification of the term, his will will be upheld. " His will stands as a reason for his actions."

True it is held, that where the legatee who stands in a confidential relation to the testator, himself draws the will, this circumstance calls for increased vigilance on the part of the court in ascertaining the validity of the will. But in such cases, the most that has been or ought to be required, is satisfactory evidence that the testator was of sound mind, and clearly understood the contents of the will, and was at the time under no restraint. No case has gone so far as to overthrow a will duly executed, where it was shown that the party executing it was of sound mind, and clearly understood its contents, though it was drawn by the person taking the estate.

A person may by fair argument and persuasion induce another to make a will, even in his own favor. (3 *Denio*, 37, 43, *Jewett, J.*) It is said by Mr. Jarman on this subject to be the result of the cases, that influence to vitiate an act, must amount to force and coercion, destroying free agency. (*See Jarman on Wills, page* 36 *to* 40, *and Notes—Perkins' Second American Edition.*)

III. What then is the evidence in this case? The will was not drawn by the Messrs. Wilson, or either of them, nor was it drawn in their presence. It was drawn by Mr. Flanagan, and the testatrix perfectly understood its contents. Mr. Flanagan says, "she appeared to know perfectly well what she was about. *The will was read over carefully, and she appeared to understand it perfectly.* Again, on his cross-examination, he says: "*The will was very carefully and distinctly read over to her.* She being a woman, I wanted her to understand distinctly what she was about; after I read it, she signified her comprehension of it, and she executed it."

IV. The testatrix was of sound mind. The evidence before adverted to, establishes it beyond question. It goes further. It shows that she was not a woman of a weak mind, or that her intellect was impaired. It shows more—that she was not a person likely to be influenced by others.

V. The evidence tends to prove that the legatees had no influence over her—that she would have her own way. Wetmore says, "I think she was a woman who would have her own way. I have no doubt but in both of these cases, I could have made a better bargain with her counsel than with her." Swain says, "she was not so under their influence as to be advised by them. She would not comply with their advice. My impression of her character is such, that I think an endeavor to influence her, would have had a contrary effect." He gives instances of her disregarding the Messrs. Wilsons' advice.

VI. The disposition of her property is in accordance with her repeated declarations made before, and also after the making of the will. She had great regard for Messrs. Wilson, and said she intended to give them her property. See testimony of Mr. Tappan, Mr. Swain, Mr. Cummings.

VII. Excluding her relatives from all participation in her

property, is also in accordance with oft repeated declarations. The only testimony that conflicts with this, is that of Mr. Masterson. He says on two occasions the deceased spoke of making a will, on one of which she said—she was going to make a fair division of her property among her relatives. She was not then angry with her niece. She doubtless at one time entertained such an idea, but she subsequently became displeased with the niece, and dissatisfied with her relations. She then changed her mind. She was a woman of obstinate character, would have her own way—of strong prejudices and feelings; and when she conceived a dislike to her niece, she manifested it emphatically—she determined not to give her a farthing. The evidence leads to this conclusion most irresistibly. On the other occasion, she said to the witness, with a laugh, I have made a will *for my relatives.* She did not say in favor of her relatives; but she laughed, and was evidently chuckling over the idea, that she would disappoint them for some real or fancied wrong done her, or for their ill-treatment of her. The declarations made by her in respect to Messrs. Wilson proved by Radford, were after the contract in 1853, after she had suffered from paralysis, and after her mind had become weakened by disease.

VIII. There is no evidence to show that Messrs. Wilson in any manner directed the dispositions made of the property by the will. Mr. Flanagan says in his cross-examination, " I think Mr. Wilson instructed me how to draw the will as to the contents." But on his further direct examination, he says, " Mr. Wilson merely mentioned the naked fact, that Mrs. Smith was coming down to have her will drawn. I think he did not state what its contents would be."

It is of little importance whether Mr. Wilson did or did not state what the contents of the will would be, so long as it is satisfactorily proven that the testatrix was of sound and disposing mind, and knew and understood the contents of the will she executed.

The fact is very clear to my mind, that he did not state the

contents. The confusion of the witness on this subject is easily accounted for. His *recollection of the facts* is, that he drew the will while Mrs. Smith was sitting in the office. But seeing the date was left blank, and having no recollection of having but one interview with Mrs. Smith, he *infers* that he drew the will before she came, and *infers* also, that Mr. Wilson gave directions as to the contents.

To hold from this evidence that Mr. Wilson did give such directions, is to disregard the recollection of the witness as to the facts, and to substitute his inference drawn from a fact, that does not necessarily follow from that fact.

IX. This then is this case, and it appears to me that the evidence is wholly insufficient to justify a reasonable suspicion that this will was unfairly obtained.

The following cases are decisive authorities in support of this will:—*Barry* vs. *Butlin*, 1 *Curteis' Ecc. Rep.* 637; *Durling* vs. *Loveland*, 2 *Curteis' Ecc. Rep.* 225; *Wyatt* vs. *Ingram*, 3 *Haggard's Ecc. Rep.* 466. *These cases are cited in* 4 *Barbour's Sup. Ct. Rep.* 393. *See also Jarman on Wills, page* 43, 44, 45.

It is said by Jarman (*page* 43): " Although the testator and the maker of his will, may stand in a relation favorable to the exercise of undue influence by the latter; and though there may be suspicious conduct, and some deficiency of capacity, yet, satisfactory evidence of the *factum* may establish the instrument: it is not in law invalid."

Again at page 44: " The increased strictness of scrutiny and proof required in cases where the person by whom, or by whose procurement and direction a will is drawn, receives a benefit under it, and in cases of doubtful capacity, is only such as to give full and entire satisfaction to the court or jury that the testator was not imposed upon, but that he knew what he was doing, and the dispositions he was making when he made his will."

THE SURROGATE.—The decedent, by her will bearing date the second day of November, eighteen hundred and forty-eight, gave all her property, with the exception of her household furniture and wearing apparel, to Peter Wilson and Harris Wilson. The following is the clause of the will making that disposition: "I give, devise, and bequeath, to Peter Wilson and Harris Wilson, of said city, counsellors at law, in consideration of my sincere regard for them, and of the many kindnesses and services performed by them for me, and the many suits and other matters of business done and transacted by them for me as my attorneys and counsel, and on my behalf, and for my benefit; all the rest, residue and remainder of all my property," &c. The probate of the will is contested by several nephews and nieces of the decedent on the ground of incapacity and undue influence. The decedent, several years before the execution of this instrument, had made a visit to Ireland for the purpose, in part, of seeing her sister and relatives, and on her return to this country she brought one of her nieces with her. She appears not to have continued upon good terms with her niece, and also to have expressed dissatisfaction with her relatives. In 1848 she made this will, which remained unrevoked at the time of her death. Its execution in all formal respects is fully proved by the subscribing witnesses, and there being no ground for suspecting her competency at that period, or indeed until five years afterwards, there is nothing in the way of admitting it to probate save the fact that the two legatees were her professional advisers. It becomes important in view of that circumstance, to inquire more particularly into the case, in order to ascertain whether there are traces of fraud, circumvention, or the exercise of influence incident to the confidential relation which existed between the parties.

Mr. Flanagan, who drew the will, testifies that it was drawn and executed at his office, where the decedent called on him for that purpose. From the language of the will not being such as he ordinarily uses, he thinks it must have been taken from some other instrument, though he has no recollection of any other being produced. From the fact that the

date was left blank in the draft, he at first inferred that he drew the will before he was called on by the decedent; but upon further reflection, he states his strong impression that it was drawn while Mrs. Smith was present, and that the date may have been left blank in consequence of the uncertainty of immediately obtaining a proper subscribing witness. Mr. Flanagan also testified that Mr. Wilson first spoke to him on the subject of a will, and he added: "I think he instructed me how to draw the will, as to its contents and provisions," but he afterwards said, "He merely mentioned to me the naked fact that Mrs. Smith was coming down to have her will made. I don't think he stated what its contents would be, but merely stated the naked fact." All that is satisfactorily proven by this witness in respect to the origination of the transaction, is the knowledge of Mr. Wilson, one of the legatees, that the decedent was about to make her will. As the testatrix was his client, and he would naturally have been the person to draw the instrument had she designed to dispose of her property among her relatives, it is highly probable he was acquainted with her intention in his favor, and directed her to Mr. Flanagan as a proper person to employ. Under such circumstances the ordinary presumptions flowing from the fact of formal execution are not sufficient to entitle the instrument to probate. A will by a client in favor of an attorney is not absolutely invalid. The mere existence of that confidential relation does not annul the act. In such a case there is no testamentary incapacity, but still the circumstances call for the largest degree of circumspection and vigilance to see that the act was in consonance with the views and wishes of the testator, and was not the result of influence exercised through the medium of the existing confidential relation. There should be very clear evidence of mental capacity, and satisfactory proof independently of the mere *factum* that the mind free, unbiased and uninfluenced, accompanied the act. Courts very justly look with great suspicion and jealousy upon all such wills, and are bound to scrutinize the acts and motives of the parties in the closest

manner. In *Ingram* vs. *Wyatt*, 3 *Hagg.*, 466, the great fact upon which the validity of the will turned was the relation of attorney and client existing between the devisee and the testator, and the Court of Delegates, in reversing the decision below, found that the presumption arising from that relation had been rebutted, and the suspicion cleared up and removed. This is not a novel principle, but is analogous to the rule prevailing at Common Law in similar cases. It is in substance a rule of evidence to the effect that proof of formal execution alone is not enough to force a conclusion, and that even after the *factum* is formally established, the burden remains on the proponent to show by additional testimony, spontaneousness and volition.

The first important circumstance in making this inquiry is the absence of the party to be benefited at the time of the execution. This of itself is not conclusive against improper interference, for influence may be so great as to govern its subject when withdrawn from its immediate action. But still here is a certain degree of liberty, which would have been wanting in case the legatee had been present. It is true that if the testatrix had been induced to make this will, the legatee might have ascertained how she had disposed of her property from the draftsman, but it does not appear that any inquiry was ever made on that point, and after execution the testatrix took the instrument away with her. As to capacity and intention, Mr. Flanagan testifies that the decedent was of sound mind, memory and understanding, and appeared to know perfectly what she was about. The will was carefully, slowly, and distinctly read over to her, and she appeared to understand its contents perfectly. He adds that she spoke somewhat in terms of commendation of the Messrs. Wilson. Mr. Flanagan was acquainted with the decedent, but not intimately, for eight or ten years. The other subscribing witness, Mr. Tappan, who had known her for twelve or fifteen years, says that "she understood herself very well. Her mind was apparently clear." Mr. Tappan was in Mr. Wilson's law office from 1837 to 1845, and had there abundant opportuni-

ties of observing her mental capacity. He says she was "a strong-minded woman, with very strong prejudices and feelings generally. She was very competent to take care of her business and manage her affairs." He adds that she did little, if anything, without consulting the Messrs. Wilson, and her papers were kept at their office. Mr. W. C. Wetmore was acquainted with the decedent for several years, saw her occasionally and had negotiations with her. He says: "I found her to be quite an intelligent woman for one in her position in life. She understood her matters in all transactions she had with me as well as any woman I ever had to deal with. I don't recollect seeing her since 1846. She was a woman of apparent will and energy of character." Mr. Swain knew the decedent from 1840, and was in the habit of seeing her in the office of Peter Wilson, where he was a clerk, down to the spring of 1848. He says: "I never doubted her competency in the least. She was a very active and a very determined woman. I don't think she was ever worsted in any litigation she ever commenced. She was very close to make a bargain, and appeared to understand general matters of business very well." "In 1848 her faculties were as vigorous as at any previous period." Mr. Cummings, who was in Mr. Wilson's office from February, 1843, to the spring of 1849, and conversed with the decedent frequently, states that "she was a remarkably shrewd, intelligent, and business-like woman." This evidence is very satisfactory as to her testamentary capacity, and there is nothing to bring against it except the opinion of two witnesses.

Peter Ruck, who was acquainted with the decedent a number of years, says she was a "queer woman to deal with," "strange in some things," "a very singular woman in her dealings," and "was quite changeable in her mind." The only fact he mentions as the basis of his opinion is that she wished his father to buy some leasehold premises in Jay Street, for $800, and a year or two afterwards, when he was willing to purchase, she refused to sell, "saying she had been advised by somebody that it was worth more." Mr. Radford,

who purchased this property two years since for $4500, also thought the decedent was always "a singular woman." The reasons he gives are that "she used to spend half a day alongside of an apple woman at her stand;" and that in the negotiations for the sale of the property, "sometimes she would appear to be willing to sell, and at other times not." "It was very difficult to get her to any point, and still difficult to break it off, for there were inducements held out to continue on the treaty. This is what I mean by saying she was singular in her conversation. She would talk off and on." This witness also states that towards the latter part of her life, there is no doubt that at times the decedent "was not of good sound mind," but he does not indicate the time with any precision, nor mention any grounds for the opinion, except that at a visit to her room in the summer after the sale of the Jay Street house, he noticed an impediment in her speech and an unnatural haste in her conversation. There is nothing in the evidence of these two witnesses deserving serious attention, except the statement of Ruck that the decedent offered to sell property worth $4500 for $800; but in order to attach any importance to such a fact its date must be shown; and the Court would have been better satisfied if the father of the witness, the person to whom the offer is alleged to have been made, had been produced, instead of a bystander.

An element which it is always proper to consider in this class of cases, and which is very material in determining the probability of the will having been the free act of the decedent, is the exhibition of the testator's wishes orally expressed as to the disposition of the estate. The evidence on this point agrees with the provisions of the will of the decedent, for although declarations in favor of her relatives are testified to, they appear to have been made before any unfriendly feelings towards them arose in her mind.

Mr. Tappan states that she always spoke of her relatives in unfriendly terms, but expressed great esteem for the Wilsons, and especially for Peter Wilson. Mr. Swain testifies that she often told him she was going to leave her property

to Peter and Harris Wilson—"that she had left it to them." He says, "I don't recollect whether she assigned the reason, or whether I knew it. I knew they had done all her business and had a great deal of trouble with her affairs. She appeared to consult them about every matter. She also told me that as to her people at home, she was not on good terms with them—did not agree with them—did not like them—that she was sorry she had brought one of them out." Mr. Cummings says, "I frequently heard Mrs. Smith speak as to the disposition of her property after her death. She said that Harris Wilson and Peter Wilson should have her property, and that her relatives certainly never should. I have heard her express herself very bitterly against her niece, Mary. I have heard her speak of having visited Mary's mother and left money with her, regretting that she had done so, in consequence of her having passed this niece upon her." On the other hand, Peter Ruck testifies that the decedent told him she had a niece in Ireland, and when he asked her to whom she was going to leave her property, said, "She had relatives in Ireland, and she intended to leave some of it to some of them." This was before her niece came out. Michael Masterson also states, "She told me she was going to Ireland to find out her sister and her children, so that she might will some property to them." "Some time after her return, she told me she had made a will, and then she laughed, and said she had willed my daughter Catharine something. She said in that conversation, she had made a will for her relatives and had given Catharine something." Before that, and after her return from Ireland, she told me "she would will her property to her relations, and make a fair divide. This is all she said at that time. She was not angry with her niece at this time."

It is manifest, then, that this instrument was made when the decedent's testamentary competency was beyond impeachment, when indeed she was abundantly able to manage her affairs with intelligence, shrewdness, and energy. The parties benefited were not present at the transaction, the provi-

sions seem to be consonant with the state of her dispositions and affections, and with her declarations, and the instrument thus executed, was left unrevoked, though if a desire to revoke had existed, there was ample opportunity to carry the wish into effect, without the act being disclosed. Another important circumstance in this connection, is the fact that the health of the decedent was good at the time of the execution, and the will could not, therefore, have been procured in the immediate prospect of death. Besides, there is not a trace of actual influence exerted, and unless the Court is prepared to declare the doctrine that a will in favor of persons standing in such confidential relations is void on its face, it would be difficult to imagine a case so free from any direct proof of improper dealing. Six years are allowed by the decedent to pass, and there is not a sign of an effort to repudiate the transaction, not even an oral declaration, that she had been influenced or urged to its accomplishment. She lived by herself, was the mistress of her own movements, and might at any time, had she been so inclined, have made different testamentary dispositions. Her failure to do so throws light upon the *factum* of her will, and confirms its correspondence with her wishes and intentions. The state of her intercourse with her relatives does not raise a contrary presumption, and her verbal declarations come in to corroborate and strengthen the case. Being satisfied that the instrument contains the true will of the decedent, I must therefore decree sentence of probate.