# CHARLESTON.

LEWIS *v.* CHESAPEAKE & OHIO RY. CO.

Submitted January 13, 1900—Decided March 31, 1900.

1. CARRIERS—*Loss of Freight—Damages—Liability.*

   The Chesapeake and Ohio Railway Company received for shipment to Liverpool two car loads of lumber, and issued its bill of lading, containing, among others, this clause: "(12) This contract is executed and accomplished, and all liability hereunder terminates, on the delivery of the said property to the steamship, her master, agent, or servants, or to the steamship company, or on the steamship pier at the said port [Newport News]; and the inland freight charges shall be a first lien, due and payable by the steamship company." *Held,* that the placing of the lumber on the pier of the Chesapeake and Ohio Railway Company at said port, under its own exclusive control and custody, was not sufficient to relieve it of its liability as a common carrier for damages for the loss of said lumber.   (p. 659).

2. DEMURRER TO EVIDENCE—*Judgment.*

   On a demurrer to evidence, if the evidence is such that the court ought not to set aside the verdict of a jury in favor of the demurree, the court should give judgment against the demurrant.   (p. 664).

Error to Circuit Court, Kanawha County.

Action by C. C. Lewis against the Chesapeake & Ohio Railway Company.   Judgment for plaintiff, and defendant brings error.

*Affirmed.*

SIMMS & ENSLOW, for plaintiff in error.

FLOURNOY, PRICE & SMITH, for defendant in error.

McWHORTER, PRESIDENT:

On the 1st day of March, 1897, and on the 11th day of the same month, C. C. Lewis shipped over the Kanawha and

Michigan Railway two car loads of lumber, consigned to E. D. Hotchkiss, Newport News, Virginia, to be shipped to Liverpool, England. Lewis sent the bills of lading issued by the Kanawha and Michigan Railway to Thurston Lewis, at Cincinnati,—the agent of the Chesapeake and Ohio Railway Company, who issued foreign bills of lading over the Chesapeake and Ohio Railway and the Chesapeake and Ohio Steamship Company, Limited. One car load arrived at Newport News on the 12th day of March, and the other on the 31st day of March, 1897. That arriving on the 12th of March was unloaded on the 19th of March, and the other was unloaded on the 10th of April, and the lumber piled on the pier of the Chesapeake and Ohio Railway Company at the place, to be delivered to the Chesapeake and Ohio Steamship Company. In the early morning of the 27th of April the pier took fire from the adjoining pier, and the lumber was destroyed. Lewis brought his action of trespass on the case against the Chesapeake and Ohio Railway Company in the circuit court of Kanawha County for damages for the loss of the lumber. Defendant demurred to the declaration, and each count thereof, in which plaintiff joined, and, on being argued, the court overruled the demurrer, to which ruling defendant excepted; but as defendant neither in its petition for writ of error nor in its brief adverts to the same, and as the declaration seems to be sufficient, it will be so regarded. On the 29th of March, 1899, a jury was impaneled and sworn to try the general issue of not guilty. When the evidence was all in, the defendant demurred in writing to plaintiff's evidence, in which the plaintiff joined, and the jury returned a verdict, subject to the decision of the court on the demurrer, assessing the damages of plaintiff at the agreed sum of two hundred and seventy dollars and thirty cents in case the court should overrule the demurrer. On the 29th of March the court overruled the demurrer to the evidence, and entered judgment upon the verdict. Defendant obtained from one of the judges of this Court a writ of error and contends that the court erred in not sustaining the demurrer to the evidence, for the reason that the stipulation in the bill of lading exonerated the company from liability from fire not caused by the carrier's negligence; and, sec-

ond, "that the lumber was delivered at Newport News, and the bill of lading exonerates the company for any loss not occurring through its negligence after its delivery at the port for trans-shipment by the steamship company;" and, third, "that the stipulation provides that the company shall only be liable as warehouseman after it is placed in its warehouses or piers, and there was no negligence shown on the part of the company, and in fact it did not leave it to presumption, but the company showed by its testimony that it was not negligent." The clause in the bill of lading relied on by appellant to exonerate it for any loss in this case is as follows: "(12) This contract is executed and accomplished and all liability hereunder terminates, on the delivering of the said property to the steamship, her master, agent, or servants, or to the steamship company, or on the steamship pier at the said port; and the inland freight charges shall be a first lien, due and payable by the steamship company,"—and cites *Railway Co.* v. *Clayton*, 173 U. S. 348, 19 Sup. Ct. 421, 43 L. Ed. 725, in support of its position, the syllabus of which case is as follows: "The Texas and Pacific Railway Company received at Bonham, in Texas, four hundred and sixty-seven bales of cotton for transportation to Liverpool. It was to be taken by the company over its road to New Orleans, and thence to Liverpool, by a steamship company, to which it was to be delivered by the railway company at its wharf in New Orleans. Each bill of lading contained the following, among other, clauses: 'The terms and conditions hereof are understood and accepted by the owner, viz: (1) That the liability of the Texas and Pacific Railway Company in respect to said cotton, and under this contract, is limited to its own line of railway, and will cease, and its part of this contract be fully performed, upon delivery of said cotton to its next connecting carrier; and in case of any loss, detriment, or damage done to or sustained by said cotton before its arrival and delivery at its final destination, whereby any legal liability is incurred by any carrier, that carrier alone shall be held liable therefor in whose actual custody the cotton shall be at the time of such damage, detriment, or loss.' The cotton reached New Orleans in safety, and was unloaded at the wharf, and the

steamship company was notified; but, before it was taken possession of by that company, it was destroyed by fire at the wharf.   The owners in Liverpool having brought suit against the railway company to recover the value of the cotton, that company, on the facts detailed at length in the opinion of the court, contended that the cotton had passed out of its possession into that of the steamship company, or, if the court should hold otherwise, that its liability as common carrier had ceased, and that it was only liable as a warehouseman.   *Held*, that the goods were still in the possession of the railway company at the time of their destruction, and that that company was liable to their owners for the full value, as a common carrier, and not as a warehouseman."   It is true, in that case the decision seems to turn on the provision in the bill of lading that "that carrier alone shall be held liable therefor, in whose actual custody the cotton shall be at the time of such damage, detriment, or loss;" and the defendant had placed the cotton on its own wharf at the place of delivery to the steamship company, and had notified the latter company that the cotton was upon the wharf, ready for the steamship company to take it away, and made request that it be removed; but the company had not received it, and it was held to be in the actual custody of the defendant.   And it is stated in the opinion in the case that: "It may be taken as established by the evidence that the cotton in question was for some days before the fire in a position on the wharf ready to be taken by the steamship company.   So far as the management of the wharf and the protection of the cotton against fire were concerned, the evidence failed to show any negligence on the part of the railway company.   The defendant moved for a verdict in its behalf upon two grounds: (1) The evidence showed a delivery to the connecting carrier before the fire occurred; (2) if no delivery took place before the fire, there had been a sufficient tender of the cotton to the steamship carrier, and thereafter, in view of the facts, the railway company should be deemed to have held it as a warehouseman, and, as there was no proof of negligence, it was not liable for the value of the cotton."   And it was held that defendant could not convert itself into a warehouseman by proving that it had, before

the fire, tendered the goods to the connecting carrier, and that the latter neglected, although without reasonable excuse, to take them into its actual custody. "There is no room for the contention that the defendant had ceased to be a carrier, and become a warehouseman. It had done no act evidencing its intention to renounce the one capacity and assume the other. Although it had requested the steamship line to remove the cotton, it had not specified any particular time within which compliance was insisted on, and had not given notice that the cotton would be kept or stored at the risk of the steamship line upon failure to comply with the request. The request to come and remove it 'as soon as practicable' was, in effect, one to remove it at the earliest convenience of the steamship line. There is nothing in the case to indicate that the defendant had not acquiesced in the delay which intervened between the request and the fire."

It is contended by appellant in its brief that stipulation No. 12 in the through bill of lading "expressly provides that the contract of the Chesapeake and Ohio Railway Company is executed and accomplished when the lumber should be placed on the pier of the steamship company at Newport News, which was done." The pier upon which the lumber was placed was not the pier of the steamship company, but the pier of the defendant, entirely and wholly under its control and in its custody, and over which the steamship company had no control. The shipper, by this contract, was to understand that the steamship company had a pier at Newport News, under its control and custody, and that, when his lumber should be placed on such pier, it would be in the care of a reliable and responsible company. But it was not placed on the pier of the steamship company, but on the pier of defendant, and remained in its care and custody; and, as held in *Michigan Cent. R. Co.* v. *Mineral Springs Mfg. Co.*, 16 Wall. 318, 21 L. Ed. 297: "Public policy will not allow the carrier to escape responsibility on storing the goods at the end of his route, without delivering, or an attempt to deliver, to the connecting carrier. If there be a necessity for storage, it will be considered a mere accessory to the transportation, and as not changing the nature of the bailment." In *Mc-*

*Donald* v. *Railroad Co.*, 34 N. Y. 497, it is held: "When goods are shipped and must pass through the hands of several intermediate carriers before arriving at the place of their destination, the duty of each intermediate carrier is to transport the goods safely to the end of his route, and deliver them to the next carrier beyond. An intermediate carrier in such case does not relieve himself from liability by simply unloading the goods at the end of his route, and storing them in his warehouse, without delivery or notice to, or any attempt to deliver to, the next carrier." *Goold* v. *Chapin*, 20 N. Y. 259. Appellant did nothing to change its relation from that of carrier to warehouseman, although it is claimed that delivery was made by placing the goods on its own pier, and yet retaining control and custody of it. The contract fairly bears the construction that the delivery was to be on the pier of the steamship company. If it were not intended to be so understood, clause twelve should have provided distinctly for delivery on its own pier, from which the steamship was loaded; and, even with such provision, it is very doubtful whether it could escape its liability as carrier. Such a provision, if held good, would place the shipper under the necessity of having an agent at the port to look after the reshipment of his goods, to pass them on to their destination. In this case the shipper lives and does business some four hundred or five hundred miles from the terminus of appellant's route, and it would be unreasonable to require him to look after the transfer of his goods. There was certainly no delivery of the goods on the pier of the steamship company at the port of Newport News. In *Berry* v. *Railroad Co.*, 44 W. Va. 538, (30 S. E. 143), it is held that "a contract or clause in a bill of lading limiting the liability of a common carrier or exempting it is valid, provided it is based on a valuable consideration, and does not so limit or exempt from liability or negligence of the carrier." *Maslin* v. *Railroad Co.*, 14 W. Va. 180; *Brown* v. *Express Co.*, 15 W. Va. 812; *Zouch* v. *Railway Co.*, 36 W. Va. 524, (15 S. E. 185), 17 L. R. A. 116; 5 Am. & Eng. Enc. Law, 298. There is nothing in the case at bar to show that there was any valuable consideration for any of the limitations or exemptions in favor of appellant, in the way of reduced freight or

otherwise.   Appellant cites and relies on *Railroad Co.* v. *Reeves*, 10 Wall. 176, 19 L. Ed. 909; *Morrison* v. *Davis*, 20 Pa. St. 171; and *Denny* v. *Railroad Co.*, 13 Gray 481.   In all these cases the proximate cause of the loss of the goods was the result of the immediate act of God.   In the first, an unexpected and unusual flood in the Tennessee river at Chattanooga, where the tobacco in question was caught by the waters in the defendant's cars.   In the case of *Morrison* v. *Davis*, when the goods were being transported on a canal they were injured by the wrecking of the boat, caused by an extraordinary flood.   And in *Denny* v. *Railroad Co.*, while the goods were properly in the depot of the defendant at Albany, they were submerged by a sudden and violent flood in the Hudson river.

While appellant does not contend for it in its brief, in its petition for writ of error it seems to rely upon the eleventh clause of the bill of lading to give it the character of warehouseman after the lumber was placed on its pier at Newport News, which provision is that "no carrier shall be liable for delay, nor in any other respects than as warehouseman, while the said property awaits further conveyance; and in case the whole or any part of the property specified herein be prevented, by any cause, from going from said port in the first steamer of the ocean line, as above stated, leaving after the arrival of such property at said port, the carrier hereunder then in possession is at liberty to forward said property by succeeding steamers of said line, or, if deemed necessary, by any other steamer."   It appears, however, that two steamers of the line which was to carry the lumber left the port after the last car of the lumber should have arrived at the port.   It was received by appellant on the 12th of March, and should have been at the port some days before the sailing of the Kanawha, on the 24th of March, and was there some days before the departure of the Rappahannock, on the 3d of April.   Whether the lumber was forwarded "with reasonable dispatch" to Newport News (the last car being received on the 12th, and reaching port on the 30th, of March) was a fact for the jury to decide.

It is contended by appellee that the carrier, being bound at common law to forward the property intrusted to it,

with reasonable dispatch, on failure to do so is liable for
its loss. *McGraw* v. *Railroad Co.*, 18 W. Va. 361. The
second clause in the bill of lading recognizes this obliga-.
tion, when it provides that "no carrier is bound to carry
said property by any particular train or vessel, or in time
for any particular market, or otherwise than with as rea-
sonable dispatch as its general business will permit;" and
it is claimed to be shown by the evidence that defendant
was guilty of most culpable and inexcusable negligence
and delay in forwarding this lumber. By defendant's wit-
ness, C. E. Doyle, it is shown that three or four days are
considered a very good time on coal from the coal territory
up here to Newport News, and the class of freight in ques-
tion would be about the same. One of the cars was
shipped on the 1st day of March, and the other the 10th
day of same month. The property was destroyed by fire
on the 27th day of April; one car load having been in the
custody of the defendant fifty-seven days, and the other
forty-seven days, before it was burned. The first car
reached Newport News March 12th. The second car, in-
stead of reaching the port by the 16th of March, was not
received there until the 30th of March. It appears from
the evidence that the steamship company had at that time
three steamers plying between Newport News and Liver-
pool,—the Kanawha, Rappahannock, and Shenandoah.
The first left Newport News for Liverpool on March 24th,
and it is contended by appellee that, if the appellant had
forwarded the lumber with reasonable dispatch, both cars
would have been at Newport News in ample time to be
loaded upon that vessel, as one car had already been there
twelve days before the sailing of the Kanawha, and the
other had been twelve days in the custody of appellant,
while reasonable dispatch only requires three or four days
for it to reach the port. The Rappahannock sailed from
Newport News April 3d, and yet it was not shipped on
that vessel. Appellant introduced evidence tending to
show that the cargo of the Rappahannock had been made
up some three weeks or more before she sailed; but the
witness, H. C. Blackiston, who said that the cargo of the
Rappahannock was made up by freight that had been
brought prior to March 18th, or the 12th of March, and

that they got the information of the shipment of the two car loads on the 20th of March, and that the lumber was allotted to the Shenandoah, which should have been at Newport News on the 18th of April, but which did not arrive until the 27th of April, on cross-examination said they practically cleaned up all the Liverpool freight that was available for shipment at that time, that there was very little left when she sailed, if anything. Whether there was negligence on the part of appellant was a question for the jury, under all the evidence in the case. "If the evidence is such that the court ought not to set aside the verdict of a jury in favor of the demurree, then upon a demurrer to that evidence the court should give judgment against the demurrant." *Heard* v. *Railway Co.*, 26 W. Va. 455; *Fowler* v. *Railroad Co.*, 18 W. Va. 579. The judgment of the circuit court is affirmed.

*Affirmed.*

# CHARLESTON.

47   664
50   525

47   664
51   367
52     5

47   664
62   499