# CHARLESTON.

### Stewart *v*. Lyons

Submitted June 16, 1903—Decided December 12, 1903.

1. WILL—*Contest.*
    In a contest at law over a will either the proponent or the contestant may demur to the evidence. How the evidence is considered. (p. 667).

2. WILL—*Witness.*
    Evidence of witnesses present at the execution of a will is entitled to peculiar weight, and especially is this the case with the attesting witnesses. (p. 675).

3. WILL—*Testator.*
    It is not necessary that a testator possesses high quality or strength of mind to make a valid will, not that he then have as strong mind as he formerly had. The mind may be debilitated, the memory enfeebled, the understanding weak, the character may be peculiar and eccentric, and he may even want capacity to transact many of the business affairs of life; still it is sufficient if he understands the nature of the business in which he is engaged when making a will, has a recollection of the property he means to dispose of, the object or objects of his bounty, and how he wishes to dispose of his property. (p. 676).

4. WILL—*Capacity of Testator.*

When incapacity of a testator is alleged against a will the vital question is as to his capacity of mind at the time when the will was made. (p. 677).

5. WILL—*Testator—Free Agency.*

The influence resulting from attachment or love, or mere desire of gratifying the wishes of another, if free agency is not impaired, does not affect a will. The influence must amount to force or coercion destroying free agency; it must not be the influence of affection or attachment; it must not be mere desire of gratifying the wishes of another, as that would be strong ground to support the will; further, there must be proof that it was obtained by this coercion, by importunity that could not be resisted, that it was done merely for the sake of peace, so that the motive was tantamount to force and fear. (p. 677).

7. WILL—*Testator.*

The will of a person of competent testamentary mind and memory is not to be set aside on evidence tending to show only a possibility or suspicion of undue influence. (p. 678).

8. WILL.

Merely because a testator may be incompetent to safely transact the general business affairs of life does not render him incompetent to make a will. (p. 679).

9. WILL.

The fact that a man and woman have had or still have unlawful sexual intercourse will not alone invalidate the will of one in favor of the other, or afford a presumption of undue influence. It is only a circumstance to be considered along with other matters. (p. 679).

Error to Circuit Court, Wetzel County.

Action by Frank Stewart and others against Aaron Lyons and others. Judgment for plaintiffs, and defendants bring error.

*Affirmed.*

B. M. AMBLER, J. A. HOWARD, and R. E. L. SNODGRASS, for plaintiffs in error.

W. G. SNODGRASS, T. P. JACOBS, and E. L. ROBINSON, for defendants in error.

BRANNON, JUDGE:

A writing was admitted to probate by the clerk of the county court of Wetzel county as the will of Mary A. Brookover. When this probate came up for confirmation before the county court, Aaron Lyons and others contested such confirmation and denied the validity of the will, and upon trial of the contest the court held the paper not to be such will, and refused to confirm the probate made by the clerk. An appeal was taken by Houston Stewart, the sole devisee and legatee under the will, of the circuit court, and after two trials without decision by reason of hung juries a third trial was had before a jury, and the proponent demurred to the evidence of the contestants, and the court having compelled the contestants over their objection to join in the demurrer, gave judgment that the writing was the will of Mary A. Brookover, from which judgment the contestants have sued out a writ of error from this Court.

The first question presented for decision is based on the compulsion of the contestants to join in the demurrer to evidence. It is argued that he who bears the burden of proof cannot compel his adversary to join in demurrer to evidence, and that as the proponent of a will carries the burden of proof, there is error in the ruling of the court compelling the contestants to unite in the demurrer. In West Virginia, the rule is not that a party on whom rests the burden cannot demur. Either party may demur to the evidence, unless the case be very clearly against the demurrant, or the court itself has reasonable doubt as to what facts should reasonably be inferred from the evidence. *Hollandsworth* v. *Stone,* 47 W. Va. 773; *Bowman* v. *Dewing,* 50 *Id.* 445. The evidence on both sides must be incorporated in the demurrer. Then comes the question of the principle of the consideration of that evidence, and here the rule is properly put in the opinion by JUDGE DENT in the latter case, that all the evidence on both sides must be considered as if there were a motion to set aside a verdict for the demurree, and that is, discard all evidence of the demurrant conflicting with that of the demurree, or the credit of which is impeached, and all inferences which do not fairly arise from his own evidence, and as admitting all that may be fairly and reasonably inferred from the evidence of the demurree. *Shaver* v. *Edgell,* 48 W.

Va. 502; Hogg's Plead. & Forms, 537; *Lewis* v. *Railroad,* 47 W. Va. 656; *Gunn* v. *Railroad,* 43 *Id.* p. 681; *Garrett* v. *Ramsay,* 26 *Id.* 345.

Therefore, there is no error in enforcing a joinder in the demurrer.

The next question is the sanity of the testatrix. Mary Lyons was born a poor country girl, witl out apportunities for education, culture or refinement. "Chill penury repressed the living rage and froze the genial current of the soul." She worked as a domestic, as a menial, from childhood. When up in years somewhat, after hard years, she accepted the offer of marriage with an aged man, Jennings, who owned a home in the town of New Martinsville, so that she might have a home, or perhaps under promise that it would be given to her at her husband's death, as it was. She was compelled to and did support her aged husband and herself at the washtub of the families of New Martinsville. After her husband's death she continued at the washtub or in the kitchens of other people. Some years later she married a very respectable man, Brookover, prominent in his county, who was twice its sheriff, and once a justice, and who owned a home in New Martinsville and some land near it, a few acres, which he devised to her. Thus she was owner of considerable property, not of great value when she so acquired it, but which later came to be of considerable worth, but not a large estate. She was a dutiful, kindly wife to both husbands. She had only one child, which died when a few weeks old. She had brothers and sisters, the contestants of her will. Her aged mother lived with Mrs. Brookover, and while there secured a pension. The brothers and sisters claimed part of it from the mother, and Mrs. Brookover, proposing to take care of her, denied them their right, and a bitter quarrel arose between her and her brothers and sisters about it, and they became perfectly estranged, not exchanging visits, and Mrs. Brookover forbade them entry to her house. She blamed one brother also for furnishing her mother tobacco. The feeling between them for years before her death was intense, as is admitted on both sides. Mrs. Brookover was warm and kindly to friends, but intensely resentful and bitter towards enemies, or those whom she regarded as such. We can say that if, for real or fancied cause, she took up a dislike or prejudice against a person, she never

forgave or relented. She was illiterate, just able to read a little print. She was rude, sometimes coarse, often using profane language, especially when excited or angered. Sometimes, as a witness says, she seemed refined, but often otherwise. A witness says, she came in the last years of her life several times a day to his saloon and drank liquor. This does not seem well established; but certain it is that no set drink habit or inebriety is established. No one says she was a drunkard, or even seen drunk. She was, in the opinion of several witnesses, peculiar and eccentric, but not many features or exemplifications of this are shown. For instance: She owned a little dog, and when she moved from the house to which it was accustomed it refused to go with her. She manifested special attachment to it, going back to see it, taking it candy, and on one occasion killing a chicken and giving it the gravy to lick, and covering it up to keep it warm. When her husband, Brookover, died she sent to Sistersville to an undertaker saying she wanted a fine casket for him, refused to take one offered, wanted a silver one, saying she wanted "Pap" to be put away nicely, as he had been good to her, and she did not want a wood coffin that would let the water in. She wanted a silver one, the witness thinking she meant an alluminum one. She refused to accept one he offered, and ordered him to get one regardless of cost, and he ordered a heavy steel one costing $190, and she was pleased with it. On one occasion she shoved about an acquaintance visiting her house and kicked him, and he caught her foot and threw her. The witness says he regarded that she did this in joke. Her husband, Brookover, had a life insurance policy, and upon his death she went to the agent to inquire about it, and learned that Brookover had got the money on it, when she exclaimed: "The damned old son of a bitch, if I had known that I wouldn't have bought him an iron coffin. I would have bought him a chestnut coffin, so he could go through hell a-crackin." She was offered a good price for some property, but suspecting that the purchase was being made for a certain person she said she would sell, but she would see that person in hell before she would sell to him; she would not sell to "them sons of bitches." She became incensed at this family because in the great flood in the Ohio the water deluged her home, and she went into the house of this family, and she thought that her husband was not treated right

while there. The head of this family says she got angry, he did not know why. A witness says that she was governed by prejudice and "would always have foolish, silly talk. I can't recollect the talk." He then relates the talk just given in relation to selling some property. One of the strongest witnesses against the sanity of the testatrix is Dr. Dinsmore, a doctor of Pennsylvania, who visited Mrs. Brookover when he practiced in New Martinsville some eight years before her death. He says she was sick, was averse to his examination, indisposed to answer questions or to exhibit interest in herself, and from this chiefly he concluded she was of weak mind. He thought she would not improve in mind in time. He treated her for not only "mental depravity and constitutional weakness, but for other disabilities of the system," not saying what disabilities. When asked what he meant by "mental depravity" he said, "weakness of mind; a weak state of mind." When asked if she was a *non compos mentis* he declined to say so, saying that might conflict with the answer he had already given.

A physician, Curtis, who treated her only once gave the opinion that she was insane, and thought she would be liable to delusion, but did not know that she had delusion. His acquaintance with her was limited, he said. A witness, Hall, said she had no discriminating judgment. His chief reason was that she brought suit to sell her own property devised by her husband. There were debts against his estate, some admitted by her, some denied, and she brought suit to fix debts and sell some of her husband's realty therefor, and Hall, a lawyer, purchased under the decree, a surplus being left from that part sold, which surplus went to her. He said when she would consult any one about a matter she used the standing expression, "you wouldn't do it, would you?" He did not think she was able to transact business. But he says he contracted with her for the property at $3,000. He told about her going to his house to see the dog and bring it candy and other things to eat. Col. McEldowney says she was a woman of inferior mind and could be influenced for good or evil. Dr. Underwood said she was "irrational", and "had no capacity to tranasact business. Her mind at times was unsound." She would generaly call her husband "old man", some times "old devil". I infer it was *jocose* conversation. It does not appear that it was in anger. I have given the bulk and sub-

stance of the evidence and facts claimed to prove the incompetency. The evidence to sustain the capacity of the testatrix goes to show in effect as follows: That she felt it necessary to toil for a living and did so, working in many families. She rented out her own house at higher rent and rented for herself a smaller house for a lower rent to save money. No waste of money by her is shown. She went to a bank to deposit money coming to her from the sale of some land after paying her husband's debts so as to have it draw interest. She went to see about her husband's life insurance to get the benefit of it. The Ohio River Railroad Company trespassed on her land, or denied her a stipulated crossing, and she tore down a fence the company had built, and cut off one part of her land from another. She made a compromise contract with the attorney of the company. She was active and persistent in claiming right to her mother's pension as she was keeping her. She rented her property, paid taxes, cared for her houses, had repairing done, consulted lawyers about this and that of her business. The evidence fully shows that she was persistent in caring for property and claiming her rights in it. She was careful to take receipts for money paid. She was scrupulous to close up the funeral expenses of her husband, saying she wanted the matter closed. The will discloses her idea that the property would sell better divided into lots, and evinces a desire that her home lot be not sold for a number of years. In August, 1899, the testatrix was seized with an acute suden attack of vomiting and purging and died in a few hours, aged about 50 years. She went to the house of Hattie Debolt. Hattie Debolt was living in the house of Mrs. Brookover as tenant. Hattie Debolt urged Mrs. Brookover to go to bed, and tendered her a gown, but Mrs. Brookover sent her to her own house to get her own gown, and gave her specific directions to bring her watch that she might know when to take her medicine, and to get certain letters from her trunk and elsewhere she could find them. She told Hattie Debolt that if she died she did not want certain people to have anything to do about burying her, perhaps referring to undertaking. She also told Hattie Debolt to read the letters, and she would know what to do, if she died. Hattie Debolt says that she knew a Mr. Stewart was going with Mrs. Brookover, and she supposed that Mrs. Brookover meant that he

would take care of her after death, and that Mrs. Brookover often said she would not want her relatives about. Mrs. Brookover when active and in usual health set about making her will, giving to an attorney who usually attended to her business, Snodgrass, a memorandum of her wishes. He prepared the will and gave it to her, telling her that he preferred that it should not appear in his writings, as he had resided in the same town, Mannington, where Stewart lived, and it might be charged that he had unduly influenced her to make the will in favor of Stewart, and told her to go to another lawyer, Bowers, and get him to copy it. She did so. Some time later she called on Snodgrass to go to the office of Bowers with her to witness the will. They went and the will was executed, Snodgrass and Bowers witnessing it, and it was committed by her to the custody of Bowers. This was thirteen months before her death. Stewart was not present. It is to be noted that the first draft simply provided for payment of debts and funeral expenses; but when she had Bowers to redraft it she provided that "the funeral expenses incurred in purchasing casket and all other things necessary shall be equal to that incurred in the burial of my late husband, A. P. Brookover, Esq."

Some time after her last husband's death Houston Stewart met with Mrs. Brookover and formed an attachment to her, visited her a number of times; and wrote her many love letters, breathing great love, devotion and tenderness for her. We have no letters of hers in reply, but her letters from him were found in her possession, some found by Hattie Debolt and given by her to an attorney against the will, and others found in her house by one of the appraisers and given to the same attorney. Considering the great number of his letters and the considerable period of time covered by them, and his visitation to her, we are warranted in saying that she reciprocated his affection. Her will says: "The reason I make this kind of disposition of my property is because the devisee, Huston Stewart, has favored me and accommodated me when my relatives did not, and refused to do so."

We hold that the evidence is not sufficient to overthrow this will. Courts must be cautious how they deny to the owners of property the full right of disopsition. The law gives to the owner absolute dominion over it, and full, indeed arbitrary, pow-

er of the disposition, and this right is under the law sacred next to the right to life and liberty. We may say that the act of Mrs. Brookover in giving her estate, not large, to a stranger in blood, and disinheriting her blood, was wrong; but the law does not regard sentiment in this matter. It can only inquire whether the fact tends to show incompetency. It is the strongest argument against the will; but when we consider the circumstances, it loses weight. Remember that the testatrix was a lonely widow, childless, friendless, desolate, her own kindred estranged, bitter feelings between them, she cherishing resentment against them, saying in her last solemn act that they had abandoned her, sent her no helping hand. To whom would she give the little property? To whom more probably, more reasonably, than to Stewart, who loved her, visited her, expressed warm affection for her when others were cold, and who, as she certifies in her will, befriended and accommodated her? It is said there was illicit relation between them. It is not proven. Stewart denies it under oath. But even if there was such relation, what of it? If she was competent, the law gave her absolute power to will him all she had. We cannot now try them for illicit intercourse. They are both now in that city teeming with the countless millions of all past time, and we have no just right to condemn without proof.

> "No farther seek his merits to disclose,
> Or draw his frailties from their dread abode,
> (There they alike in trembling hope repose)
> The bosom of his father and his God."

Was Mary Brookover competent in mind to make that will? This is the sole, single question, and all criticism upon testatrix and devisee and their relations, all argument based on the disinheritance of her kindred, are unavailing and abortive in law. So are all arguments of evidence going only to show mere peculiarity or eccentricity of character, disposition or habits of the testatrix, if they do not overthrow her testamentary capacity. Who has not peculiarity, personal weakness? How many of us guilty of profanity, rudeness, coarseness, unjustifiable hot blood at times? This woman saw a hard life from childhood up. She was always a "poor o'erlabored wight," against whom fair fortune turned its face, and little wonder that she, like many

others in like circumstances, was irritable, coarse and embittered. She had no chance for education. "Put yourself in her place." What if she was unskilled and incompetent to transact business? Most women are. She had little property to experience her in business until late years, and that not of a character to give her such experience; but the little she had she seems to have attended to well. She did not waste, but guarded her property with watchful eye. Witness her care for the bank deposit, the life insurance, the pension money of her mother, the struggle with the railroad company for a crossing, taking receipts for payments, paying taxes, scrutinizing debts presented against her husband's estate, her affectionate solicitude for the fitting burial of her husband from whom she derived her estate, and the reason she gave for that solicitude; her anxiety and care, in the agony of deadly sickness in her dying hours, for those letters sacred to her, which she did not wish the world to see, and which, notwithstanding her thoughtful care to protect herself and her lover, were wrongfully taken from proper custody and used as weapons against her will and to cast aspersion on his and her names. Witness the sedate preparation of her will, and the change from its first draft, so as to provide as secure a burial against water entering her casket as she had sedulously provided for her husband. Is this evidence of insanity? How many shudder at the thought of the invasion of the caskets of loved ones by water, and resort to vaults and other devices, at last wholly unavailing, to shut it out, as if water were not as pure as the devouring worm? The shudder is but human. This woman was not singular and alone in this weakness. Or shall we call it weakness? It seems that she still had sense enough to have emotions tender, and human, and whatever her character they found a place in her breast. Call to witness for her sanity her care to prepare her will. She knew that without it her kin would get her estate, and that she declared again and again should not be. True, one witness says that some months before her death she said the law should take its course; but many times over she declared the reverse. And she could change her mind. And her will shows she did so, if ever since she had intended otherwise. Call to mind her contract with Hall for the sale of some lands. It is not said that she did not get a fair price or that she got the worse of the

bargain. While he says she had no discriminating judgment, and talked silly, he gives no good, adequate reason, and his contract with her goes to the contrary, and it seems he would have taken her deed and paid her $3,000, if she had not brought suit to convene liens and fix debts, some of which she disputed, against her husband. This suit is no evidence of insanity. The suit was necessary and prudent; yet Hall on the witness stand, at first gave that suit as evidence of her incapacity. Recall that she directed that the land be not sold in bulk, if sold, but in lots, and that her house in town be not sold for some years. Why? Because property in New Martinsville and its suburbs had already greatly increased, and she expected it would continue to do so, and thus the more benefit her devisee; or else she had pride in having the lots go for the benefit of many. Whatever her motive, this manifests her appreciation of the property and prudence for the future. She knew her property. The circumstances appealed to for the defeat of the will are frail, and some of them operate the other way. The attack upon the will at most amounts to charges of coarseness, profanity, intense prejudice against certain enemies and chiefly that the testatrix was incompetent to transact business. No mania, no delusions are shown. No imbecility, for she was a vigorous, active, restless woman of energy and positiveness of character. Here I will add a very potent fact. Five of the contestants' witnesses, at least, Robbinson, Col. McEldowney, T. S. McEldowney, Hall and Dr. Underwood, while stating that she was incompetent to transact business, yet when asked if Mrs. Brookover had sufficient power of mind to know what property she owned, and to know who were her relatives, and to know how she wanted to dispose of her property, and to know what she was doing with her property, and to know that she was willing it to Stewart, all answer that she did. This alone fixes her capacity. Regardless of all other evidence, this establishes the ability of Mrs. Brookover to make the will. In addition, we have the evidence of Bowers and Snodgrass, the attesting witnesses, squarely sustaining competency at the very moment of its execution, and that is the most important point of time to be considered. *Martin* v. *Thayer,* 37 W. Va. 38; *Delaplain* v. *Grubb,* 44 W. Va. 612; *Farnsworth* v. *Noffsinger,* 46 *Id.* 410. "Evidence of witnesses present at the execution of the will is

entitled to peculiar weight, and especially is this the case with attesting witnesses." *Kerr* v. *Lunsford,* 31 W. Va. 659, section 15. Then we have for the proponent the evidence of Thompson, clerk of the county court, who says he tried to buy property of her, but could not agree on the price, thus attesting her ability to care for herself. He knew her, took a bond of her as executrix of her husband, and who fully attests her soundness of mind. Under the circumstances of this case the following law vindicates this will against impeachment for insanity:

"It is not necessary that a person should possess the highest quality of mind in order to make a will, nor that he should have the same strength of mind, which he may formerly have had; the mind may be in some degree debilitated, the memory may be enfeebled, the understanding may be weak, the character may be eccentric, and he may even want capacity to transact many of the ordinary business affairs of life; but it is sufficient if he understands the nature of the business in which he is engaged, has a recollection of the property which he means to dispose of, the objects of his bounty and the manner in which he wishes to distribute it among them. Where legal capacity is shown, and the testator acts freely, the validity of the will cannot be impeached, however unreasonable, imprudent or unacountable it may seem to the jury or to others." *Nichols* v. *Kershner,* 20 W. Va. 251; *Martin* v. *Thayer,* 37 *Id.* 38.

Attack is made upon the motives of the attesting witnesses. Bowers is assaulted on two grounds. One that he was paid by Stewart for drafting the will. He was entitled to pay from some quarter. Stewart gave him a note for $100 payable on condition that the will should be sustained. Bowers swears that Mrs. Brookover owed him for legal services. If so, the estate would be liable in Stweart's hands for its payments, if the will should stand; otherwise not. Stewart did no wrong in giving such a note; Bowers did no wrong in taking it. It is charged against Snodgrass that he read the love letters of Stewart to Mrs. Brookover and answered them, and knew Stewart's designs upon the woman, and was in conspiracy with Stewart. This charge is gratuitous. It is not sustained by the evidence unless by far fetched inference or suspicion for want of evidence. Snodgrass was the general and confidential attorney of Mrs. Brookover in winding up her husband's estate and her

adviser. She could not read writing or write. She would get some one to do so, and reasonably would call on Snodgrass. We do not see that this impeaches his evidence. Be this even as it may the evidence for sanity is enough without his evidence, and evidence assailing the will is not sufficient. I refer to this matter, but do not deem it material.

The next charge to overthrow the will is, that Stewart procured it by undue influence. The claim is that he wrote her love letters, in effect promising marriage, when he did not intend to do so, and thus induced the will. There is no evidence of any request or opportunity by or for Stewart to Mrs. Brookover to make the will. He was absent when it was made. So, we cannot say that influence was operative when it was made at the attorneys office. "Undue influence to avoid a will must be such as to overcome the free agency of the testator at the time the instrument was made." *Forney* v. *Farrell,* 4 W. Va. 729.

The testatrix again and again through years declared that her kin should not have her property, and declared that she intended to will it to Stewart. She gave an attorney direction to draw a will in his favor more than thirteen months before death, so that she had ample time for reconsideration and revocation; and so the will reflects sedate design. To whom else would she give her property? What is undue influence that will overthrow a will? The evidence shows affection, attention and kindness from Stewart to the lonely widow, bereft of friendly kin. His letters show this. "A disposition of property, induced by gratitude for kindness, affection and esteem is not the result of undue influence." 27 Am. & Eng. Ency. L. 497. "The influence resulting from attachment, or mere desire of gratifying the wishes of another, if the free agency of the party is not impaired, does not affect the validity of the act." *Greer* v. *Greer,* 9 Grat. 330. In *Parramore* v. *Taylor* 11 Grat. 239 and *Simmerman* v. *Songer,* 29 Grat. 24, the court adopted the following from Williams on Execution: "The influence to vitiate a will must amount to force and coercion, destroying free agency; it must not be the influence of affection or attachment; it must not be the mere desire of gratifying the wishes of another, for that would be very strong grounds in support of a testamentary act; further, there must be proof that it was obtained by this

coercion, by importunity that could not be resisted, that it was done merely for the sake of peace, so that the motive was tantamount to force and fear." These principles are found in *Forney* v. *Farrell*, 4 W. Va. 742. The Supreme Court says that to set aside a deed or will for undue influence it must be shown "that the party had no free will, but stood *in vinculis.*" "It must amount to force and coercion, destroying free agency." *Conley* v. *Nailor*, 118 U. S. 127, 135. "Even earnest entreaty, importunity and persuasion may be employed, as well as appeals to remember past kindness or relieve distress. The criterion is, is the influence irresistible? If so, the will is not the instrument of the testator, and cannot stand. If it is not, the influence is not undue and its existence is immaterial, even though the testator did in fact yield to it." 27 Am. & Eng. Enc. L. 498. These principles were held in *Delaplaine* v. *Delaplaine,* 44 W. Va. 612. In *Byer* v. *Le Fevre,* 186 U S. 114, Justice Brewer in the court's opinion said: "One who is familiar with the volume of litigation now flooding the courts cannot fail to be attracted by the fact that actions to set aside wills are of frequent occurrence. In such actions the testator cannot be heard, and very trifling matters are often pressed upon the attention of the court or jury as evidence of want of mental capacity or of the existence of undue influence. Whatever rule may obtain elsewhere, we wish it distinctly understood to be the rule of the Federal Courts that the will of a person found to be possessed of sound mind and memory is not to be set aside on evidence tending to show only a possibility or suspicion of undue influence. The expressed intention of the testator should not be thwarted without clear reason therefor." Justice Brewer said, as we say in this case, there is no evidence of importunity even request by Stewart that Mrs. Brookover should make a will in his favor, no threat, no coercion, nothing to show that it was not her free will, but every thing to show that it was. The only ground is those love letters, impliedly promising marriage. If Mrs. Brookover loved Stewart, she had perfect right to give him her property, when she no longer needed it herself. But illicit intercourse is hinted at. It is merely hinted by the contestants, but not proven. It is disproven. But suppose it were so. It would not be an undue influence to overthrow the will. "Undue influence, long passed, and not shown to be in any way

connected with the testamentary act, is not evidence to impeach a will. Where a testator and legatee unlawfully cohabited, and it was alleged that years previous she had falsely accused the testator of seducing her, the facts are not sufficient evidence of undue influence over the mind of a testator in the testamentary act, where it appears the will was properly and formally drawn, and every one but the attorney who drafted it was excluded from the room when the instructions were given." *Wainwright's Appeal,* 89 Pa. 220. In this case Stewart was miles away and no one present but testatrix and attorneys. A man devised his estate to a woman with whom he had unlawfully cohabitated, disregarding his brothers and sisters; it was held that undue influence could not be presumed from such cohabitation, but it must be proven that undue influence was actually exerted. *Porschet* v. *Porschet,* 82 Ky. 93. Fraud or undue influence must have some effect upon the testator "in producing the very act of making the will." "A will cannot be invalidated because produced by influences springing from a lawful or unlawful marital relation, unless such influence has been unduly exercised; and to have the effect of avoiding the will, the influence must place some restraint upon and prevent the free exercise of the testator's judgment and motives in making the will." *Monroe* v. *Barclay,* 17 Ohio St. 302, 93 Am. D. 620. In *Goodbar* v. *Lidky,* 136 Ind. 1, the court held that the presumptions in favor of a will, attacked for undue influence, are increased, rather than diminished, from the circumstance that a bequest was made to one with whom the testator maintained intimate and confidential relations during life." The court said this is particularly so where the testator has no wife or children, but only brothers and sisters. One may will his property to a paramour, if he chooses, unless courts assume to make wills for others. But there is, in this case, no evidence of sexual intercourse, only a charge based on suspicion; there is no intimacy shown, only occasional visits. Stewart lived and did business forty miles away, and traveled over a wide territory selling tombstones, and was seldom in New Martinsville. But we must not forget that the law puts the heavy burden of proving undue influence upon those who attack the will. *McMechen* v. *McMechen,* 17 W. Va. 683, section 11.

Exception is made because certain non-experts and expert wit-

nesses were not allowed to answer certain questions, as to whether Mrs. Brookover was capable of transacting business. A sufficient answer is, that the questions do not show what must have been the answers, nor is it shown what it was proposed to prove by the questions. We cannot say whether there would have been any answer, or what answer, or whether material. "Where an answer to a question is excluded, the exception must show what the party asking the question expected to prove." *Brock* v. *Bear*, (Va.) 42 S. E. 307; *Jackson* v. *Hough*, 38 W. Va. 236. But, in fact, there is no substantial ground of exception even guessing at answers. The questions contemplated mere answers of opinion.

"The mere *opinions* of witnesses not experts are entitled to little or no regard, unless supported by good reason, founded on facts which warrant them, and if the reasons and facts on which they are founded are frivolous, the opinions are worth but little or nothing." *Jarrett* v. *Jarrett*, 11 W. Va. 584, section 10. These witnesses were all allowed to state their facts fully, and it was for the jury to judge what they showed, not for the witnesses to tell the jury what, in their opinion, should be their conclusion from those facts. The facts were mostly or all light and frivolous. Should a trial be upturned for so light a cause? Dr. Dinsmore knew the woman slightly; had practiced in New Martinsville the latter part of 1891 and nine months in 1892, six years before the will, and then moved to Pennsylvania. He called on Mrs. Brookover once, and because she was indisposed to be examined and receive treatment, as many people are, he took up the opinion that her mind was not good—a very inadequate reason. He stated facts, and gave opinion as to her mind, and the jury could well form an opinion as to the effect of his evidence as an expert, and simply because he was not allowed to give his opinion, his mere opinion, as to her capacity for business, we are asked to reverse a trial. What though Mrs. Brookover was not accomplished in business? That capacity is not necessary to make a will. Is a man or woman inefficient in business to be denied right to make a will? If she was capable of recollecting the property she was about to dispose of, the manner of disposing of it, and the object of her bounty, that is enough, though she could not transact general business. *Greer* v. *Greer*, 9 Grat. 330.

That she knew her property well the will, as well as all the evidence, shows, as it gives one direction as to one piece of real estate, another as to another. And not only three witnesses of the proponent, but also five witnesses of the contestants, with hardly any to the reverse, say distinctly that when she made that will she had ample power and strength of mind to know what property she had, how she was disposing of it, what she wanted to do with it, and the person to whom she was giving it. This being decidedly shown by the evidence, this being the test under all the authorities, and this exclusion of evidence touching only the question of insanity, other evidence becomes practically immaterial and unavailing, and therefore the excluded evidence, even if we dare *guess* what it would have been, could not, ought not, in justice have changed the result.

Therefore, we affirm the judgment.

*Affirmed.*