Cyrus E. SILLING, Jr., Plaintiff,

v.

Edna Marie Litton ERWIN, As Executor of the Estate of Willard H. Erwin, Jr., Deceased, et al., Defendants.

Civ. A. No. 2:94–0448.

United States District Court,
S.D. West Virginia,
Charleston Division.

April 25, 1995.

Christopher J. Winton, Mark W. Kelley, Payne, Loeb & Ray, Charleston, WV, Richard J. Miller, Jr., James Barriere, Couch, White, Brenner, Howard & Feigenbaum, Albany, NY, Josef A. Horter, Goodwin & Horter, Charleston, WV, for plaintiff Cyrus E. Silling, Jr.

Arden J. Curry, II, Pauley, Curry, Sturgeon & Vanderford, Charleston, WV, for defendant Edna Marie Litton Erwin, as Executor of Estate of Willard H. Erwin, Jr., deceased.

Neva G. Lusk, G. Thomas Battle, Spilman, Thomas & Battle, Charleston, WV, for defendant United Nat. Bank, as Executor of Estate of Cyrus E. Silling, Sr., deceased.

Raymond G. Dodson, Dodson, Riccardi & Lutz, Charleston, WV, for defendant Jane King.

## MEMORANDUM OPINION AND ORDER

HADEN, Chief Judge.

Pending is Defendant Edna Marie Litton Erwin's Motion for Summary Judgment. Defendant Erwin asserts as a matter of law: 1) Plaintiff is incompetent to testify regarding transactions or communications with his deceased father; 2) Silling, Sr. had the requisite mental capacity to execute the codicil dated April 13, 1991; 3) the April 13, 1991 codicil was executed properly; 4) Plaintiff may not prevail on a claim based upon undue influence; 5) Plaintiff is estopped from contesting the validity of the April 13, 1991 codicil; 6) the contribution to the Shriners Hospital for Crippled Children was authorized and made at the request of Silling, Sr.; 7) Plaintiff's claims for fraudulent suppression of dividends may not be presented to the jury; 8) Plaintiff may not prevail on his claim Erwin improperly received a gift of ten thousand dollars ($10,000.00); and 9) Plaintiff may not recover on a claim regarding charges for accounting services by Erwin.

The parties have submitted memoranda in support of their respective positions and the matter is mature for adjudication. For the reasons that follow, the Court **GRANTS** the motion on all issues.

Under *Rule 56(c)* of the *Federal Rules of Civil Procedure*, summary judgment is proper only:

"If the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law."

Fed.R.Civ.P. 56(c). A principal purpose of summary judgment is to isolate and dispose of meritless litigation. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party has the burden of initially showing the absence of a genuine issue concerning any material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Once the moving party has met its initial burden, the burden shifts to the nonmoving party to "establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552.

To discharge this burden, the nonmoving party cannot rely on its pleadings but instead must have evidence showing that there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. at 2553. If there is a complete failure of proof concerning an essential element of the non-moving party's case there can be no genuine issue of material fact and the moving

party is entitled to judgment as a matter of law. *Id.* at 322, 106 S.Ct. at 2552.

## FACTUAL BACKGROUND

The undisputed facts are as follows. Cyrus E. Silling, Sr. ("Silling, Sr.") died at the age of ninety-three on June 6, 1993, a resident of Kanawha County, West Virginia. Silling, Sr. executed his Last Will and Testament on November 25, 1988 and three codicils dated April 13, 1991, June 12, 1992 and September 7, 1992.[1] The will and the three codicils were admitted to probate by the County Commission of Kanawha County on June 9, 1993 supported by authenticating affidavits of witnesses.

By his will, Silling, Sr. appointed Willard H. Erwin, Jr. ("Erwin") and the United National Bank ("Bank") Co–Executors and provided should Erwin become unable to serve, the Bank should continue as sole Executor. The Co–Executors qualified to serve on June 9, 1993. Erwin died on May 21, 1994 and this action is maintained against his widow, Edna Marie Litton Erwin, as executrix of his estate and the Bank.

Erwin was an accountant, minority shareholder, president, and director of One Morris, Incorporated. He also handled the finances of Silling, Sr. and held a general power of attorney over him.

The will devises and bequeaths the residue of Silling, Sr.'s estate to the Plaintiff. The codicil dated April 13, 1991, bequeathed two hundred and forty-two (242) shares of capital stock of One Morris[2], Incorporated to Erwin.

The Plaintiff has received partial distributions under Silling, Sr.'s Will of eighty thousand dollars ($80,000.00) in May 1994 and approximately nine hundred and twenty-eight thousand dollars ($928,000.00) in cash and securities in December 1994.

Silling, Sr. owned a controlling interest of fifty and one tenth percent (50.1%) of the shares in One Morris for many years prior to his death in 1993. In fact, at all times since 1950, he was the largest shareholder of One Morris. He was a director and an officer of One Morris at all times since the 1960's. One Morris did not declare a dividend in its forty-five year history. Plaintiff contends dividends should have been paid since 1986, when all remaining corporate debt was retired.

The Second Amended Complaint attacks, *inter alia,* the validity of the codicil on the grounds of alleged lack of testamentary capacity of Silling, Sr., the alleged lack of testamentary formalities, the alleged exercise by Erwin of undue influence over Silling, Sr., and the alleged tortious interference by Erwin with the rights of the Plaintiff as affected by the codicil. Plaintiff further alleges Erwin, acting as an officer and director of One Morris, Incorporated, fraudulently suppressed dividends of the corporation.

The Second Amended Complaint also alleges Erwin committed a breach of trust by virtue of his position as attorney-in-fact to Silling, Sr.: 1) when he allegedly made unauthorized gifts totalling seventy-five thousand dollars ($75,000.00)[3] to Shriners Hospitals for Crippled Children; 2) when he allegedly made an unauthorized gift of ten thousand dollars ($10,000.00) to himself; and, 3) when he allegedly made unauthorized payments of compensation to himself totalling fifty-six thousand eight hundred dollars ($56,800.00) for services rendered.

By Memorandum Opinion and Order entered April 4, 1995, 881 F.Supp. 236, this Court granted Defendants One Morris, Incorporated, Frank T. Litton, Jr. and Forrest Morris summary judgment and dismissed them from this action with prejudice.

---

1. The validity of the will is not in dispute. Furthermore, all parties have reached agreement the second and third codicils were not executed properly and are invalid. Consequently, the sole inquiry before the Court regarding Silling, Sr.'s testamentary disposition is whether the April 13, 1991 codicil is valid.

2. Former Defendant One Morris is a closely held corporation that owns and manages an apart-

ment building in Charleston, West Virginia. Former Defendants Frank T. Litton, Jr. and Forrest Morris were elected directors of One Morris in July 1994.

3. The parties have since stipulated that no more than thirty-five thousand dollars ($35,000.00) in contributions were made. *See, infra* at 893–894.

## DISCUSSION

### I.

### PLAINTIFF'S COMPETENCE TO TESTIFY REGARDING TRANSACTIONS OR COMMUNICATIONS WITH HIS DECEASED FATHER

■ In West Virginia,

"No party to any action ... nor any person interested in the event thereof, nor any person from, through or under whom any such party or interested person derives any interest or title by assignment or otherwise, shall be examined as a witness in regard to any personal transaction or communication between such witness and a person at the time of such examination, deceased, ... against the executor, administrator, heir at law, next of kin, assignee, legatee, devisee or survivor of such person.... But this prohibition shall not extend to any transaction or communication as to which any such executor, administrator, heir at law, next of kin, assignee, legatee, devisee, survivor or committee shall be examined on his own behalf, nor as to which the testimony of such deceased person or lunatic shall be given in evidence[.]"

W.Va.Code § 57–3–1 (1937). The term "personal transactions and communications" has been given a broad interpretation which includes every method whereby one person may derive impressions or information from the conduct, condition, or language of another. *Kuhn v. Shreeve*, 141 W.Va. 170, 89 S.E.2d 685 (1955); *Miami Coal Co. v. Hudson*, 175 W.Va. 153, 332 S.E.2d 114 (1985).

> "It has oft been stated that the purpose of the Dead Man's Statute is to prevent an undue advantage on the part of a survivor over a decedent. F. Cleckley, *Handbook on Evidence for West Virginia Lawyers* 43 (1978); Note, "Reevaluation of the Dead Man's Statute," 69 W.Va.L.Rev. 327, 328 (1967). In such circumstances the decedent is unable to confront the survivor, give his version of the affair, and expose the possible omissions, mistakes or per-

haps even outright falsehoods of the survivor."

*Miami Coal*, 332 S.E.2d at 119.

Furthermore, testimony has been excluded under the statute where interested children and heirs of a deceased insane person desired to testify they had observed and knew the mental and physical condition of the decedent. *Trowbridge v. Stone's Administrator*, 42 W.Va. 454, 26 S.E. 363 (1896). The Court there found the testimony incompetent because it involved transactions and communications of the insane decedent in which the witnesses were interested against him. *Id.; see Patterson v. Martin*, 33 W.Va. 494, 10 S.E. 817 (1890).

■ Individuals in the same position as the Plaintiff have been found incompetent to testify under this statute regarding any communications or transactions they had with the decedent. *Mann v. Peck*, 139 W.Va. 487, 80 S.E.2d 518 (1954) (decedent's brother barred from testifying); *Kuhn v. Shreeve*, 141 W.Va. 170, 89 S.E.2d 685 (1955) (aunt and first cousin barred from testifying).

The Court concludes the Plaintiff is barred from testifying concerning any conversations or transactions he had with Silling, Sr. including his impressions or information from the conduct, condition, or language of Silling, Sr. This proffer would implicate the mental and physical condition of Silling, Sr. Accordingly, the Court **GRANTS** Defendant Erwin's motion for summary judgment on this issue.

### II.

### TESTAMENTARY CAPACITY

■ The burden of proving the testamentary capacity of the testator at the time of the execution of the codicil is upon the proponent of the codicil, Defendant Erwin. *Rice v. Henderson*, 140 W.Va. 284, 289, 83 S.E.2d 762, 766 (1954); *Ritz v. Kingdon*, 139 W.Va. 189, 79 S.E.2d 123 (1953); *Kerr v. Lunsford*, 31 W.Va. 659, 8 S.E. 493 (1888). In order to establish the testator possessed the requisite mental capacity to execute a will:

"[i]t is not necessary that a person should possess the highest qualities of mind ... nor that he should have the same strength of mind which he may formerly have had; the mind may be in some degree debilitated, the memory may be enfeebled, the understanding may be weak, the character may be eccentric, and he may even want capacity to transact many of the ordinary business affairs of life; but it is sufficient, if he understands the nature of the business in which he is engaged, has a recollection of the property which he means to dispose of, the objects of his bounty, and the manner in which he wishes to distribute it among them."

*Ritz v. Kingdon, supra.* "Old age and eccentricity incident to it are not of themselves sufficient to establish lack of mental capacity of a testator." *Prichard v. Prichard,* 135 W.Va. 767, 65 S.E.2d 65 (1951); *Ritz, supra* 79 S.E.2d at 140; *Delaplain v. Grubb,* 44 W.Va. 612, 30 S.E. 201 (1898); *Kerr v. Lunsford, supra.* Mere infirmity of mind and body due to illness is not sufficient to establish mental incapacity. *Ritz, supra* 79 S.E.2d at 140; *Payne v. Payne,* 97 W.Va. 627, 125 S.E. 818 (1924); *Kerr, supra; Nicholas v. Kershner,* 20 W.Va. 251 (1882). A testator need not know every item of his property or the value of his estate. *Freeman v. Freeman,* 71 W.Va. 303, 76 S.E. 657 (1912). It is sufficient if he knows generally what it consists of and knows the persons to whom he desires to give it away. *Id.*

Furthermore,

"[T]he critical time to appraise the physical and mental capacity of a testator to make a will is the actual time of its execution. Concerning testamentary capacity, testimony relating to a testator's condition generally before and after the will is signed is of little or no probative value. The evidence of witnesses who were present at the execution of the will is entitled to peculiar weight, and this is especially so in relation to attesting witnesses."

*Frye v. Norton,* 148 W.Va. 500, 135 S.E.2d 603, 610 (1964) (citing *Floyd v. Floyd,* 148 W.Va. 183, 133 S.E.2d 726 (1963); *Stewart v. Lyons,* 54 W.Va. 665, 47 S.E. 442 (1904);

*Kerr v. Lunsford, supra; Nicholas v. Kershner, supra.*

In a factually similar case, witnesses in a will contest, who were present at the time of the will's execution, testified the testator was competent. *Floyd v. Floyd,* 148 W.Va. 183, 133 S.E.2d 726 (1963). The contestants there presented evidence from witnesses tending to show that, in the time period before and after the execution of the will, the testator did not have the necessary mental capacity. *Id.* The contestants, however, were unable to produce any witnesses regarding the testator's mental capacity *on the date of the execution. Id.* The Court held:

"[w]here on an issue *devisavit vel non* relating to mental capacity of a testator to make a will, there is positive, direct and uncontradicted testimony by disinterested attesting witnesses ... to the effect that at the time the will was executed the testator was in full possession of his mental faculties and assented completely to each provision thereof as read to him, as well as other positive evidence of proper mental capacity of the testator about the time the will was executed, a jury verdict against the validity of the will must be set aside where the only evidence to support such verdict is that of witnesses who were not present at the execution of the will but who testified either generally or with regard to specific dates before and after the date of the execution of the will that the testator was not mentally competent to make a will."

*Id.,* Syl.Pt. 9.

In support of her claim Silling, Sr. was competent to execute the April 13, 1991 codicil, Defendant Erwin presented the following uncontested evidence.

Each individual involved with the preparation of the codicil and its execution testified Silling, Sr. was mentally competent on April 13, 1991. Jeanette Whittington was contacted by Silling, Sr. who specifically asked her to draft the codicil in question. (Whittington Dep. 5–10). Whittington testified regarding Silling, Sr.'s mental competence at that time:

"Q: On the thirteenth of April, 1991, could you express an opinion as to whether or not Mr. Silling was mentally competent

for the purpose of placing his mark on the codicil?

A: No question in my mind. He certainly was.... it was what he wanted to do.... [and if he read the codicil or it was read to him he would definitely understand what was in it].... He was real irritated with us because we didn't get [the codicil] up [to his house] sooner."

*Id.* at 12–16.

William E. Mohler, the attorney who drafted the codicil and who was an attesting witness present at its execution [4], testified Silling, Sr. was the only individual who requested the codicil and that he was competent on April 13, 1991. (Mohler Dep. 86–89, 91–93, 98–100, 102–103). Mohler testified Silling, Sr. had called wanting Mohler to draft the codicil leaving his shares of stock in One Morris to Erwin. *Id.* at 86–87. Silling, Sr. was even aware of the number of shares he had to devise. *Id.* Mohler testified:

"I read [the codicil] to him, and I said, 'Now, this is the codicil you've been after me to get up here, and I've got it and I want to read it to you.' 'No,' he said, 'I know all about what's in there. You did what I told you. You left the stock to Willard?' I said, 'That's right, but I'm going to read it to you, anyway.' So I read him the entire codicil and said, 'Now, you understand what you're doing?' 'That's right. That's what I want done. We were in this thing together and we started it together, developed it, and I want him to end up with it."

*Id.* at 88. Mohler further testified Silling, Sr. was in poor physical health, but "his mind was very sharp and clear and there was no question but he knew exactly what he was doing." *Id.* at 92.

Jill Wiersteiner witnessed the April 13, 1991 codicil and testified regarding Silling, Sr.'s competence at that time:

"He knew what was going on. He is the one who called and set this all up.... He told Mr. Erwin on the phone, 'I want to give you this." You know, "I want to give you this. This part of the property, I want to give it to you. I want you to have the whole thing.'"

(Wiersteiner Dep. 6–8, 10–12, 18, 20–21). She further testified that although Silling had at times been confused, this was mostly related to his health problems. *Id.* at 68–70. However, on the date the codicil was signed, Wiersteiner testified he was not confused, "he was perfect. He knew what he was doing and why he was doing it." *Id.*

Dr. Albert Pfister was Silling, Sr.'s treating physician since 1981. Dr. Pfister testified Silling, Sr. was "generally depressed and very dependent [or demanding] on his home care people," (Dr. Pfister Dep. 9–10). *Id.* He noted Silling, Sr. had been diagnosed with "organic brain syndrome" which he described as "disorientation, delirium.... just not oriented to place." *Id.* at 10–11.

Notwithstanding his knowledge of Silling, Sr.'s medical condition, Dr. Pfister signed an affidavit in July 1991, approximately three months after the codicil had been executed, stating:

"he had been the attending physician to Cyrus E. Silling for the past 10 years; that, in his opinion Cyrus E. Silling is mentally competent and fully capable of handling his financial and business affairs; that he is of sound mind and deposing memory; that he is fully aware of the objects of his bounty...."

(Dr. Pfister Affidavit July 12, 1991). Dr. Pfister also testified Silling, Sr., in 1991, was coherent, would have understood what a will was, would have understood what his property was, and was not mentally incompetent. (Dr. Pfister Dep. 5, 8–9, 39, 41–43).

Jewel Carte, the Vice President of Trusts of United National Bank, was in charge of the agency account of Silling, Sr. (Carte Affidavit April 13, 1995). Pursuant to that account, she was authorized to make investments and payments on behalf of Silling, Sr. out of his accounts with that institution. *Id.* Carte testified she had weekly conversations

---

4. Mohler's and Wiersteiner's testimony regarding the competence of Silling, Sr. must be given particular weight because they were present at the execution of the codicil. *Frye v. Norton,* 135 S.E.2d at 610 (citing *Floyd v. Floyd,* 133 S.E.2d 726; *Stewart v. Lyons, supra; Kerr v. Lunsford, supra; Nicholas v. Kershner, supra.*)

with Silling, Sr. and visited him once a quarter.[5] (Carte Dep. 21, 23, 50). She had no information, either from outside sources or through her own direct dealings with Silling, Sr., that would lead her to believe he was not mentally competent to handle his affairs in April 1991. *Id.* Indeed, assessing competence was "another reason for the contact with the customers." *Id.* at 50.

Furthermore, every care provider rendering services to Silling, Sr. during April 1991 unequivocally testified Silling, Sr. was competent. (Cindy Atkinson Dep. 4, 12, 22–23) (Atkinson testified that on April 13, 1991, Silling, Sr. was mentally competent, would understand the content of the codicil, was mentally alert, and knew what he was doing); (Jackie Rutledge Dep. 33–35) (Rutledge testified that in April 1991 everything was fine with Silling, Sr.): (Delores Canterbury Dep. 19, 26, 32–33, 59) (Canterbury testified that in April 1991, Silling, Sr. was mentally competent, alert, and had no mental problems); (Lisa Bailey Affidavit Feb. 3, 1995) (Bailey states that in April 1991, Silling, Sr. was of sound mind, knew what was going on around him, and knew the value of his assets).

The Plaintiff offers evidence of Silling, Sr.'s "long history of medical problems" citing instances from the 1930's until 1977. (Plaintiff's Response at 9). Only Silling, Sr.'s business partner testified he kept in touch with him up to his death and that Silling, Sr.'s mental capacities "would just come and go" and he "wasn't real stable from the time he left the office back in [1977]." (Billy S. Marcum Dep. 40). Marcum based these beliefs on his feeling Silling, Sr. "couldn't do the administration of the office." *Id.* Marcum cited Silling, Sr.'s "failure to concentrate or comprehend." *Id.* at 42. However, Marcum also stated in his deposition he had no knowledge of the competency or mental capacity of Silling, Sr. on April 13, 1991. *Id.* at 55, 77.

Plaintiff also presents evidence Silling, Sr. twice suffered from a bowel obstruction which would cause him to become disoriented and confused. (Dr. Pfister Dep. 17–36). Those instances cited by the Plaintiff occurred, however, in January 1991 and August 1991. *Id.*

Plaintiff was and is unable to produce a single witness who can testify what Silling, Sr.'s mental capacity was on April 13, 1991, contrary to the defense version. Instead, Plaintiff relies solely upon time periods pre-

---

**5.** Plaintiff objects to the testimony of Jewel Carte regarding any and all of Defendant Erwin's claims and defenses in this action. (Plaintiff's Response at 18 and Plaintiff's Supp.Mem. on Charitable Gifts at 3). Plaintiff argues that as a bank vice president, Ms. Carte is interested in the outcome of this lawsuit in which the bank, United National Bank, is a party, and is, therefore, incompetent to testify under the West Virginia Dead Man's Act, West Virginia Code 57–3–1. *Id.* As authority for this assertion, Plaintiff cites *Stansbury v. Bright*, 109 W.Va. 651, 156 S.E. 62 (1930) and *First Nat'l Bank of Ronceverte v. Bell*, 158 W.Va. 827, 215 S.E.2d 642 (1975) (Haden, C.J.).

The Court's holding in *Stansbury* is directly contrary to the position Plaintiff wishes this Court to adopt. *Stansbury v. Bright*, 109 W.Va. 651, 156 S.E. 62, Syl.Pt. 2 (1930). The Court held "[a]lthough ... a party in interest cannot testify for himself concerning transactions had by him with one who is dead, the cashier of a bank, who has no personal interest in it, but is merely its agent, may testify for his principal against a decedent's estate." *Id.* The Court only found it proper to exclude the testimony of the vice president of the bank because he was a stockholder interested in the outcome of the suit. *Id.* 109 W.Va. at 652, 156 S.E. 62.

The holding of *First Nat'l Bank* is equally unavailing to the Plaintiff. The Court held:

"Although tested prior to trial by a summary judgment motion, the competency of, or admissibility of, evidence alleged to be controlled by W.Va.Code 1931, 57–3–1, as amended, is to be determined when the evidence is offered for introduction at trial, whether offered in the form of answers to interrogatories, depositions or 'live' testimony from a witness."

*First Nat'l Bank of Ronceverte v. Bell*, 158 W.Va. 827, 215 S.E.2d 642, Syl.Pt. 4 (1975) (Haden, C.J.).

Furthermore, the Court has also held an agent of a party to litigation is not expressly included in the Dead Man's Act as an interested person, and therefore, an agent contracting on behalf of his principal with a person since deceased is a competent witness in behalf of his principal against the estate of the deceased party to prove the transaction. *Cross v. State Farm Mut. Auto. Ins. Co.*, 182 W.Va. 320, 387 S.E.2d 556 (1989).

Likewise, the testimony of a corporate agent is not barred by the Dead Man's statute solely on account of her interest as an agent. As such, there is no merit to the Plaintiff's contentions.

ceding and following the date the codicil was executed. Under the standard set forth in *Frye v. Norton, supra, Floyd v. Floyd, supra,* and *Ritz v. Kingdon, supra,* this evidence is insufficient to rebut Defendant Erwin's evidence that Silling, Sr. was mentally competent on the date the codicil was executed. Every individual who had daily contact with Silling, Sr. in 1991, each individual present at the codicil's execution, and Silling, Sr.'s treating physician testified Silling, Sr. was competent to execute the codicil in April 1991. Accordingly, the Court **GRANTS** Defendant Erwin summary judgment that Silling, Sr. possessed the requisite mental capacity to execute the codicil on April 13, 1991.

### III.

### EXECUTION OF APRIL 13, 1991 CODICIL

■ In West Virginia,

"No will shall be valid unless it be in writing and signed by the testator, or by some other person in his presence and by his direction, in such manner as to make it manifest that the name is intended as a signature; and moreover, unless it be wholly in the handwriting of the testator, the signature shall be made or the will acknowledged by him in the presence of at least two competent witnesses, present at the same time; and such witnesses shall subscribe the will in the presence of the testator, and of each other, but no form of attestation shall be necessary."

W.Va.Code § 41–1–3 (1923).

Jill Wiersteiner, Silling, Sr.'s caretaker, and William Mohler, Silling, Sr.'s attorney, testified Silling, Sr.'s mark was placed on the will in their presence. Further, it is uncontested each witness signed in the presence of each other and in the presence of Silling, Sr. The Plaintiff has no evidence to rebut the two attesting witnesses and he cannot defeat summary judgment based upon speculation, conjecture, or argument. *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552. Plaintiff must present evidence showing the codicil was not executed properly. *Id.*

While all parties agree the notary of this codicil did not actually see Mohler and Wier-steiner place their signatures on the codicil, the fact that she did not actually witness their signatures does not invalidate the codicil. There is no requirement the notary witness the signature of the testator nor any of the witnesses. In fact, West Virginia Code, Chapter 41, Article 1, Section 3 specifically provides: "no form of attestation shall be necessary."

Accordingly, the Court **GRANTS** summary judgment that the April 13, 1991 codicil was executed properly.

### IV.

### UNDUE INFLUENCE

■ To overcome a will, undue influence must destroy the free agency of the testator. *Mullens v. Lilly, supra; Stewart v. Lyons, supra.* As the West Virginia Supreme Court has held:

"opportunity for, or possibility or suspicion of, the exercise of undue influence does not constitute or sufficiently prove the exercise of undue influence."

*Ritz,* 79 S.E.2d at 142 (citing *Ebert v. Ebert,* 120 W.Va. 722, 200 S.E. 831 (1938). "Influence which arises from acts of kindness and attention to the testator, from attachment or love, from persuasion or entreaty, or from the mere desire to gratify the wishes of another, if free agency is not impaired, does not constitute, and is not alone sufficient to establish, undue influence." *Id.*

"Undue influence to avoid a will must be such as to overcome the free agency of the testator at the time the instrument was made.... A disposition of property induced by gratitude for kindness, affection and esteem is not the result of undue influence.... The influence resulting from attachment, or merely desire of gratifying the wishes of another, if the free agency of the party is not impaired, does not affect the validity of the act.... The influence to vitiate a will must amount to force and coercion, destroying free agency; it must not be the influence of affection or attachment; and must not be the mere desire of gratifying the wishes of another, for that would be very strong grounds in

support of a testamentary act; further, there must be proof that it was obtained by this coercion by importunity that could not be resisted, that it was done merely for the sake of peace, so that the motive is tantamount to force and fear.... It must amount to force and coercion destroying free agency ... even entreaty, importunity, and persuasion may be employed, as well as appeals to remember past kindnesses or relieve distress."

*Stewart v. Lyons*, 54 W.Va. at 677–78, 47 S.E. 442 (citations omitted).

"Suggestion and advice, addressed to the understanding and judgment, never constitute undue influence; neither does solicitation, unless the testator be worn out with the importunities, so that his will gives way. Even earnest entreaty, importunity, and persuasion may be employed, as well as appeals to remember past kindnesses or to relieve distress. The criterion in every case is, is the influence irresistible? If it is, the will is not the instrument of the testator and cannot stand. If it is not, the influence is not undue. Its existence is immaterial, even though the testator did in fact yield to it."

*Delaplain*, 44 W.Va. at 624, 30 S.E. 201 (citations omitted).

■ The Supreme Court of Appeals of West Virginia has consistently held the burden of proving undue influence is upon the party who alleges the exercise of such influence. *Frye v. Norton*, 148 W.Va. 500, 135 S.E.2d 603, Syl.Pt. 5 (1964) ("the burden of proving undue influence is upon the party who alleges it and mere suspicion, conjecture, possibility or guess that undue influence has been exercised is not sufficient to support a verdict which impeaches the will upon that ground."); *Floyd v. Floyd*, 148 W.Va. 183, 133 S.E.2d 726 (1963) ("the burden of proof of such issues rests on the party alleging it"); *Ritz v. Kingdon*, 139 W.Va. 189, 79 S.E.2d 123 (1953) ("burden of proving undue influence is upon the party who alleges the exercise of such influence"); *Mullens v. Lilly*, 123 W.Va. 182, 13 S.E.2d 634 (1941) ("the burden of proving undue influence rests upon the one who assails a ... will"); *Payne v. Payne*, 97 W.Va. 627, 125 S.E. 818, Syl.Pt.

3 (1924) ("burden of proving undue influence ... is upon the contestants"); *Bade v. Feay*, 63 W.Va. 166, 61 S.E. 348 (1907) ("the burden of proof is on him who charges procurement of execution of an instrument by the exercise of undue influence"); *Stewart v. Lyons*, 54 W.Va. 665, 47 S.E. 442 (1904) ("burden of proving undue influence upon those who attack the will"); *McMechen v. McMechen*, 17 W.Va. 683, Syl.Pt. 11 (1881) ("burden of proof of fraud or undue influence ... is ... upon him who alleges it to exist").

■ Generally, there are no presumptions of undue influence in a will contest. *Ritz v. Kingdon, supra*, ("[u]ndue influence which will invalidate a will is never presumed but must be established by proof"); *Ebert v. Ebert*, 120 W.Va. 722, 200 S.E. 831 (1938) ("undue influence, sufficient to invalidate a will, is never presumed, but must be established by proof"); *Coffman v. Hedrick*, 32 W.Va. 119, 9 S.E. 65, Syl.Pt. 5 (1889) ("Upon the trial of an issue of *devisavit vel non* undue influence, in order to overthrow the will, must not only be alleged, but it must be proven by the contestants; it will not be inferred.").

However, the Plaintiff argues "[t]he general rule [that fraud, in general, is never presumed and when alleged it must be established by clear and distinct proof] is qualified and the burden is shifted where a fiduciary relationship exists." *Work v. Rogerson*, 152 W.Va. 169, 160 S.E.2d 159, 166 (1968); *Atkinson v. Jones*, 110 W.Va. 463, 158 S.E. 650 (1931) ("in a case where a fiduciary relationship exists and an inference of fraud arises, the burden of proof is then on the alleged feasor to establish the honesty of the transaction.").

"A corollary to the fiduciary principle is the rule that a presumption of fraud arises where the fiduciary is shown to have obtained any benefit from the fiduciary relationship, as stated in 37 Am.Jur.2d *Fraud and Deceit* § 441: '... if he seeks to support the transaction, he must assume the burden of proof that he has taken no advantage of his influence or knowledge and that the arrangement is fair and conscientious[.]' "

*Kanawha Valley Bank v. Friend,* 162 W.Va. 925, 929, 253 S.E.2d 528, 530 (1979).

In a situation similar to the one *sub judice,* an elderly woman informed her attorney she desired to bequeath to him certain property. *Frye v. Norton,* 148 W.Va. 500, 135 S.E.2d 603 (1964). Counsel realized it would be improper to prepare the will granting these bequests and therefore obtained alternative legal counsel for the testatrix who met with the woman and drafted the will. *Id.* Those contesting the will questioned the testatrix's testamentary capacity and argued her attorney had exercised undue influence over her. *Id.* The contestants reasoned that the existence of an attorney-client relationship and the fact that the attorney would not have shared in her estate in the absence of a will created a presumption of fraud. *Id.* at 513, 135 S.E.2d 603. The trial court gave the following instruction:

> "while the burden of proving fraud and undue influence in a contested will case ordinarily rests upon the contestants, this is not the rule if an attorney who represents the testatrix *writes or procures the writing and execution* of the will and is a beneficiary of a substantial amount under the will, and would not share in the estate except for the will, in which even there is a presumption and suspicion of fraud and undue influence which the burden of overcoming is upon the proponent of the will.... if you ... find that the [defendant] *procured an attorney or attorneys to write the said will and procure the execution of the same, then, there is a suspicion and presumption of fraud and undue influence.*"

*Id.* 135 S.E.2d at 611 (emphasis added). The Supreme Court of Appeals of West Virginia found reversible error in giving this instruction because it was not supported by the evidence. *Id.*

> "There is absolutely no evidence in the record of this case from which it can be implied that the defendant had anything to do with the writing or execution of [the decedent's] will. To the contrary, it affirmatively appears that [the defendant] *had no part whatever in the preparation* of such will.... Furthermore, it is undisput-

ed that the defendant had *no connection whatever in obtaining the execution* of the will in question.... It is sufficient to note that [the defendant], upon being requested to write a will in which he was to be a beneficiary, proceeded with due caution and in full accord with the requirements of the ethics of his profession. There is nothing in the law which prohibits a client from leaving her property to her attorney if she so desires. It is difficult to see how this defendant could have acted in a more judicious manner."

*Id.* 135 S.E.2d at 611–612 (emphasis added). Furthermore, the Court stated:

> "[t]he cases cited by the plaintiffs present circumstances where the beneficiary, holding a position of trust or confidence, *was also the draftsman of the will; where the facts show that the testator was sick and feeble and readily susceptible to persuasion;* and other factual situations which are not applicable to the facts as revealed by the record of the instant case. *In proving undue influence the facts and circumstances of each case must be considered. Culpepper v. Robie,* 155 Va. 64, 154 S.E. 687. Even if as contended by the plaintiffs, the burden shifted to the defendant to prove the absence of fraud and undue influence, we are of the view that such a burden was successfully borne. The record unquestionably shows that the defendant did not draft this will; that he was in no way concerned with its preparation or execution; that the testatrix had the capacity to make a will; and that she was fully and ably advised of all matters relating to the making of a will by independent counsel of unimpeachable character."

*Id.* 135 S.E.2d at 612 (emphasis added).

■ It is undisputed Erwin had a fiduciary relationship with Silling, Sr. He had a general power of attorney dated January 4, 1977 appointing him attorney in fact for Mr. Silling. He was also a trustee of the *inter vivos* Revocable Trust executed by Silling, Sr. on December 20, 1974. Nevertheless, the *Frye* case strongly holds the mere existence of the relationship of attorney and client between the testator and a beneficiary under a will does not in itself raise a presumption

that the attorney-beneficiary exercised undue influence to obtain the testamentary gift.[6]

It is undisputed that Erwin was not the draftsman of the codicil. Additionally, the evidence clearly demonstrates Silling, Sr. had the mental capacity to make the codicil and competent legal advise from independent counsel.[7] Further, the fact counsel read the codicil aloud in the presence of Silling, Sr. and the other witnesses, and that Silling, Sr. declared to those present the codicil was in accord with his wishes, is particularly persuasive the disposition was what Silling, Sr. desired.[8] Equally strong and prior to the codicil's execution was Silling, Sr.'s expression to disinterested parties of his desire to make the testamentary gift to Erwin.[9]

Because shifting the burden of proof requires clear and convincing evidence of procurement or draftsmanship and because Plaintiff has been unable to meet that burden, the Court **GRANTS** Defendant Erwin's motion for summary judgment on this ground.[10]

## V.

### ESTOPPEL OF PLAINTIFF FROM CONTESTING THE VALIDITY OF THE APRIL 13, 1991 CODICIL

Subsequent to Silling, Sr.'s death, Plaintiff accepted partial distributions under the will of eighty thousand dollars ($80,000.00) in May 1994 and approximately nine hundred twenty-eight thousand dollars ($928,000.00) in cash and securities in December 1994. Plaintiff then waited more than a year to challenge the codicil. After doing so, he has not offered to return any of the benefits to the estate. Defendant Erwin argues the acceptance of these distributions estop the Plaintiff from challenging the validity of the will and codicil.

A codicil is a part of a will modifying it in some respects and superseding it insofar as it is inconsistent with the original will. *Fenton v. Davis,* 187 Va. 463, 47 S.E.2d 372 (1948); *Senger v. Senger's Executors,* 181 Va. 786, 27 S.E.2d 195, 197 (1943); *Simmons v. Gunn,* 156 Va. 305, 157 S.E. 573 (1931). A will and codicil are construed together as one single instrument. *Bradshaw v. Bangley,* 194 Va. 794, 75 S.E.2d 609 (1953); *Smith v. Trustees of the Baptist Orphanage of Va.,* 194 Va. 901, 75 S.E.2d 491, 492 (1953).

For the purpose of determining the testamentary intention of the testator, a will and codicil thereto are to be regarded as a single and entire instrument, taking effect at the time of the testator's death. *Hope Natural Gas Co. v. Shriver,* 75 W.Va. 401, 83 S.E. 1011, 1016 (1914); *Unitarian Universalist Service of Boston v. Lebrecht,* 670 S.W.2d 402, 404 (Tex.App.1984); *Fischer v. LaFave,* 188 Ill.App.3d 16, 135 Ill.Dec. 698, 700, 544 N.E.2d 55, 57 (2d Dis.1989). A lawfully executed codicil becomes a part of the original will, and the two instruments stand as one testamentary disposition. *Matter of Estate*

---

**6.** See also *Yribar v. Fitzpatrick,* 91 Idaho 105, 416 P.2d 164 (1966); *Re Heim's Will,* 136 N.J.Eq. 138, 40 A.2d 651 (1945); *Re Little's Will,* 45 N.Y.S.2d 751 (N.Y.1943); *Re Bleil's Estate,* 96 Cal.App. 283, 273 P. 1088 (1929); *Wunderlich v. Buerger,* 287 Ill. 440, 122 N.E. 827 (1919); *Graham v. Courtright,* 180 Iowa 394, 161 N.W. 774 (1917).

**7.** Whether the testator had independent advice in making his will wherein his attorney was named a beneficiary is a factor that may be considered in determining whether the gift was procured by the attorney through undue influence or whether a presumption of undue influence arising from such a gift is overcome. See *Frye v. Norton,* 148 W.Va. 500, 135 S.E.2d 603 (1964); *Re Nixon's Will,* 136 N.J.Eq. 242, 41 A.2d 119 (1945); *Re Keeley's Estate,* 167 Minn. 120, 208 N.W. 535 (1926).

**8.** See *Re Patterson's Will,* 206 Misc. 268, 132 N.Y.S.2d 609 (N.Y.1954); *Re Adin's Estate,* 112 Wash. 379, 192 P. 887 (1920); *Re Cotter's Estate,* 180 Misc. 399, 40 N.Y.S.2d 93 (N.Y.1943); *Wunderlich v. Buerger,* 287 Ill. 440, 122 N.E. 827 (1919); *Bennett v. Bennett,* 50 N.J.Eq. 439, 26 A. 573 (1893); *Wilson v. Moran,* 3 Bradf. 172 (N.Y. 1855).

**9.** See *Slater v. Munroe,* 316 Mass. 129, 55 N.E.2d 15 (1944); *Re McCarty's Estate,* 141 A.D. 816, 126 N.Y.S. 699 (1910); *Re Morey's Estate,* 147 Cal. 495, 82 P. 57 (1905); *Wright v. Howe,* 52 N.C. 412 (N.C.1860).

**10.** Because the Court holds Plaintiff may not succeed on his claim of undue influence, Count II of the Second Amended Complaint regarding tortious interference based upon "unlawful and fraudulent acts and undue influence" of Erwin over Silling, Sr. must likewise fail.

*of Hamilton,* 467 N.W.2d 801, 803 (Iowa App.1991).

■ If one has accepted benefits under a will, he "must adopt its whole contents, conforming to all its provisions, and renouncing every right inconsistent with it." *Moore v. Harper,* 27 W.Va. 362 (1886). "The general rule ... is that a beneficiary who accepts such benefits is bound to adopt the whole contents of that will and is estopped to challenge its validity." *Tennant v. Satterfield,* 158 W.Va. 917, 921, 216 S.E.2d 229, 232 (1975). However, this general rule is tempered with qualifications to the doctrine of estoppel.

"In order for estoppel to bar a will contest, it must first be shown that acceptance occurred, and second it must be shown that the acceptance was of such a nature as to give rise to equitable considerations which prevent the accepting party from later negating the instrument through which he received benefits."

*Id.*

The Plaintiff's acceptance of and failure to return very substantial asset distributions from the Estate binds him to adopt the entirety of the will and equitably estops him from challenging the codicil because it has merged with the will. Accordingly, Defendant Erwin's motion for summary judgment on this issue is **GRANTED.**[11]

## VI.

## CONTRIBUTION TO SHRINERS HOSPITAL

■ Pursuant to the Court's recent direction, the parties have submitted additional briefing on the validity of certain contributions. Count III—A of Plaintiff's Second Amended Complaint alleges Erwin, acting as attorney in fact for Silling, Sr. made, from Silling, Sr.'s funds, unauthorized contributions to the Shriners Hospitals for Crippled Children ("Shriners Hospitals") in the amounts of twenty-five thousand dollars ($25,000.00) on February 20, 1991, and fifty thousand dollars ($50,000.00) on an unspecified date.

Since the allegation was made, the parties discovered these amounts are incorrect. The parties now stipulate the total charitable contributions made on behalf of Silling, Sr. to the Shriners Hospitals was thirty-five thousand dollars ($35,000.00). *Sua sponte,* the Court amends the Second Amended Complaint to conform to this claim.

United National Bank reviewed its records to determine the total amount of contributions. According to Jewel Carte of United National Bank, two checks were located. (Carte Affidavit April 11, 1995). The first check was dated November 14, 1990 in the amount of ten thousand dollars ($10,000.00) and made payable to the Shriners Hospitals on United National Bank's check number 448484. *Id.* The second check was dated February 28, 1991 in the amount of twenty-five thousand dollars ($25,000.00) and made payable to the Beni Kedem Crippled Children's Fund on United National Bank check number 452091. *Id.* Carte was unable to find any other checks issued to either of these two entities which would have made on behalf of Silling, Sr. *Id.*

Shriners Hospitals acknowledged receipt of the ten thousand dollars ($10,000.00) to "C.E. Silling, Sr. c/o United National Bank, Box 393, Charleston, West Virginia 25392" by their letter dated November 27, 1990. No other documentation exists regarding this contribution.

By letter dated February 20, 1991 to Jewel Carte, Erwin "confirmed the request of [Silling, Sr.] and his approval to disburse" twenty-five thousand dollars ($25,000.00) to "Shriner's Hospitals for Crippled Children Fund through the Beni Kedem Shrine Temple of Charleston." Then on February 28, 1991, a check payable to "Beni Kedem Crippled Chil-

---

11. Because Plaintiff is estopped from contesting the validity of the codicil, it is unnecessary for the Court to determine whether Silling, Sr. possessed the requisite mental capacity to execute the codicil, whether the codicil was executed properly, and whether Plaintiff may prevail on a claim based upon undue influence in regard to that codicil. Nevertheless, the Court examines these issues, and in each instance, the Court finds in favor of Defendant Erwin that Silling, Sr. possessed the requisite mental capacity to execute the codicil, the codicil was executed properly, and Plaintiff may not prevail on a claim based upon undue influence.

dren's Fund" was drawn on the Agency Account of Silling, Sr. at United National Bank in the amount of twenty-five thousand dollars ($25,000.00). From this twenty-five thousand dollars ($25,000.00), Beni Kedem donated fifteen thousand dollars ($15,000.00) to the Shriners Hospitals and retained the remaining ten thousand dollars ($10,000.00) in their own Crippled Children's Fund.

On March 30, 1991, a check payable to Shriners Hospitals was drawn on the account of Beni Kedem Temple Trustees account at Charleston National Bank in the amount of fifteen thousand dollars ($15,000.00) upon Erwin's authorized signature as Trustee.[12] The stub for the Beni Kedem Temple Trustees check dated March 30, 1991 identifies the funds as "Contribution received from W.H. Erwin, Jr. for donation by Noble C.E. Silling, Sr., P.O. Box 3363, Charleston, WV 25333." By letter dated April 30, 1991, Shriners Hospitals acknowledged receipt of the fifteen thousand dollars ($15,000.00) to Silling, Sr. at Post Office Box 3363 in Charleston. The address is Erwin's post office box, not Silling, Sr.'s.

Silling, Sr. had been a long-time member of the Shriners. He was a Mason of the Thirty-Third Degree and had been active in Shriners functions. Silling, Sr. told disinterested witnesses, both prior to and after contributions were made, he desired the transactions take place. However, there is scant evidence on the amounts and times the contributions were made. The witnesses testify in general terms about how Silling, Sr. remarked he had contributed to the Shriners Hospital and he believed strongly in that organization.

Cindy Atkinson, his caretaker, testified Silling, Sr. told her he had made donations to the Shriners Hospital and that he was a firm believer in that entity. (Atkinson Dep. 41). When asked if Silling, Sr. ever told her about the size and amounts of those donations, Atkinson replied:

"No, that is business. He didn't tell me business. He got mad because I overheard him on the phone with [Erwin] once when One Morris Square needed a new

furnace ... and it was four hundred thousand dollars. And I said, 'Four hundred thousand dollars.' And this was when he was up and about. And he said, 'You shouldn't have heard that.' "
*Id.*

Similarly, Delores Canterbury, another caretaker, testified Silling, Sr. told her he had made a fifty thousand dollar ($50,000.00) contribution to the Shriners Hospitals. (Canterbury Dep. 62–63).

Finally, Jewel Carte, of United National Bank, testified that when the request for a contribution of twenty-five thousand dollars ($25,000.00) came in, she verified that it was to be made with Silling, Sr. and he confirmed to her that he wanted to make the payment. (Carte Dep. 84–84; Carte Affidavit April 13, 1995). However, Carte testified she had no recollection as to who requested the November 14, 1990 ten thousand dollar ($10,000.00) contribution, nor did she have any documents which would indicate who made the request. *Id.* at 81–82. Carte indicated the donation could have been requested by either Silling, Sr. or Erwin. *Id.* Plaintiff has no evidence to contradict the contribution was made and authorized by Silling, Sr.

Because no documentation or other evidence exists regarding the November 14, 1990 contribution, other than the cancelled check and the letter from Shriners Hospitals acknowledging receipt of Silling, Sr.'s donation, there is no evidence to suggest Erwin had any involvement in the transaction whatsoever. Jewel Carte has no specific recollection of this transaction, but has testified she would contact Silling, Sr. for approval prior to disbursing any checks. Because there is no evidence to link Erwin to this transaction, Plaintiff's claim must fail.

On January 4, 1977, Silling, Sr. executed a document granting power of attorney to Erwin. The power of attorney gave Erwin the power to "give away" assets or property of Silling, Sr. in Silling, Sr.'s name and to: "make, do and transact all and every kind of business of whatsoever nature and kind; to do, execute and perform all and every other act or acts, thing or things, in law

---

12. Erwin was a Potentate and Trustee of the Beni Kedem Temple.

needful and necessary to be one in and about the premises, as fully, largely and amply, to all intents and purposes whatsoever as we or either of us might or could do if acting personally. And I hereby ratify and confirm the lawful acts done by our said attorney by virtue hereof."

(Erwin Power of Attorney Jan. 4, 1977).[13]

The power of attorney also granted Erwin the authority to sign checks and make payments directly on behalf of Silling, Sr. Rather than make payments directly, Erwin would notify United National Bank, under its agency account powers, when payments should be made. The Bank, through Jewel Carte, would verify with Silling, Sr. independently that the payments were to be made. Only if the payment was approved by Silling, Sr. would the Bank issue payment.

Erwin did not make the twenty-five thousand dollar ($25,000.00) contribution on Silling, Sr.'s behalf. Erwin merely requested the Bank, through Jewel Carte, to issue payment. As such, Erwin acted as a messenger in regard to the questioned transaction. He advised Carte on what he believed Silling, Sr. wanted done. Carte, however, would not take action based on Erwin's word. Rather, Carte independently verified with Silling, Sr. that he desired the requested contribution be made. The allegations contained in the Count III—A of the Plaintiff's Second Amended Complaint therefore must fail because Erwin did not "[make] a gift . . . of the funds of Cyrus E. Silling, Sr. to Shriner's Hospitals." Carte acted under her authority over Silling, Sr.'s agency account in verifying and issuing the check to the organization,

Erwin merely made the initial request the contribution be made on Silling, Sr.'s behalf.

Additionally, "[f]ailure on the part of the principal to dissent from or repudiate an unauthorized act of his agent, within a reasonable time . . . is evidence of ratification of the unauthorized act." *Thompson v. Murphy*, 60 W.Va. 42, 53 S.E. 908, Syl.Pt. 3 (1906). A principal "may ratify the contract either expressly or by accepting its benefits." *Payne Realty Co. v. Lindsey*, 91 W.Va. 127, 112 S.E. 306, Syl.Pt. 1 (1922); *Rest.2d Agency* § 82. Furthermore,

"[w]here with knowledge of the terms of the contract made by his agent, the principal accepts benefits thereunder under such circumstances as would make it his duty to promptly repudiate if he did not desire to be bound, he will be deemed to have ratified and confirmed the act of his agent. Such knowledge need not be shown by positive evidence; it may be inferred from circumstances."

*Payne Realty*, 91 W.Va. 127 at Syl.Pt. 2, 112 S.E. 306.

Acting under his authority as attorney in fact, Erwin sent a letter dated February 20, 1991 to Jewel Carte stating: "This is to confirm the request of Mr. Silling and his approval to disburse from his funds the sum of twenty-five thousand dollars ($25,000.00) to the Shriners Hospitals for Crippled Children Fund through the Beni Kedem Shrine Temple of Charleston." Carte testified unequivocally she remembered speaking with Silling, Sr. about the twenty-five thousand dollar ($25,000.00) contribution. (Carte Dep. 84–85).

13. It is unnecessary for the Court to determine whether the power of attorney between Erwin and Silling, Sr. was "durable," that is, whether it was valid if Silling, Sr. was incompetent, because Erwin did not actually make the contributions from Silling, Sr.'s funds. Nevertheless, Jewel Carte testified:

"[d]uring the time I had discussions with Cyrus Silling, Sr. and received approval from him on various matters on the telephone or in person, he was able to maintain discussions with me, expressed his desires on various business matters, and appeared to be competent to me. . . . In confirming his desire to make [the twenty-five thousand dollar] payment, I recall speaking with him and, during that conversa-

tion, he appeared to be lucid, responded appropriately to my inquires, and informed me that he wanted to give that contribution to that Shrine. I did not notice anything during that conversation which would lead me to believe that he did not fully understand my inquiry or competently respond."

(Carte Affidavit April 13, 1995). If Silling, Sr.'s competence were in issue, it would be his competence in dealing with the holder of his agency account. Furthermore, other than general statements about Silling, Sr.'s poor health during the periods surrounding this transaction, Plaintiff presented no evidence to contradict Carte's testimony that, on the day in question, Silling, Sr. was competent.

"Q Did you confirm this gift with Mr. Silling?

A Yes.

Q Do you specifically remember speaking to him about this?

A Yes.

Q What did he say?

A He wanted to give it to the Shrine.

Q Did he say how much he wanted to give to the Shrine?

A I just told him that I had the request for twenty-five thousand dollars ($25,-000). He said he wanted to give the contribution to the Shrine."

*Id.*

It is clear Silling, Sr. ratified and confirmed the February 28, 1991 twenty-five thousand dollar ($25,000.00) contribution so as to bind him to it.[14] Accordingly, the Court **GRANTS** summary judgment to Defendant Erwin on the total of thirty-five thousand dollars ($35,000.00) in contributions made to the Shriners Hospitals.

## VII.

### FRAUDULENT SUPPRESSION OF DIVIDENDS

■ This Court has previously ruled on Plaintiff's claim for fraudulent suppression of dividends. By Memorandum Opinion and Order entered April 4, 1995, the Court dismissed Defendants One Morris, Incorporated, Frank T. Litton, Jr., and Forrest Morris because the Plaintiff lacks standing to bring an action for suppression of dividends. *See Silling v. Erwin*, 881 F.Supp. 236 (S.D.W.Va. 1995). Plaintiff also lacks standing with regard to these claims against Defendant Erwin. Accordingly, the Court **GRANTS** summary judgment in favor of Defendant Erwin on this issue.

## VIII.

### TEN THOUSAND DOLLAR GIFT TO ERWIN

■ A questioned ten thousand dollar ($10,000.00) gift to Erwin was memorialized in a memorandum to the United National Bank Trust Department dated November 5, 1992, which contained Silling, Sr.'s mark. Plaintiff alleges this document is improper, fraudulent, and that Silling, Sr. did not authorize the gift to Erwin. The Plaintiff is prepared to show, by offer of proof at trial, the gift letter is a forgery and that a later version of the same gift letter was also falsified.

The same memorandum Plaintiff attacks as a forgery also directed certain gifts to Silling, Sr.'s grandchildren and to the Plaintiff totalling sixty thousand dollars ($60,-000.00)[15]. Plaintiff does not assert Silling,

---

**14.** Charitable contributions were also placed on Silling, Sr.'s tax return as deductions. (Erwin's Rev.Mem.Summ.Judg. 15–16). Further, there is no evidence Erwin coerced Silling, Sr. to make these contributions. Affidavits from Lisa Bailey, Rita Lynn Hayes, Cindy Atkinson, Delores Canterbury, Dovie Chapman, William Mohler, Jackie Rutledge, and Jeanette Whittington, and Jewel Carte each state that each individual had not heard Erwin request, suggest, or recommend to Silling, Sr. that any gifts be made to the Shriners.

**15.** The document in question provides:

4500 Virginia Ave., SE
Charleston, WV 25304

November 5, 1992

Memorandum for: Trust Department
Memorandum for: United National Bank
Memorandum for: Charleston, WV
Re: Gifts to be made with funds from my account, 1992
I have instructed and advised Willard H. Erwin, Jr., my Power of Attorney to disburse from my funds to the parties listed below and in the amounts indicated:
 To my Son and his children as follows:

| | | |
|---|---|---|
| My son—Cyrus E. Silling, Jr. | | $10,000. |
| My grandchildren: | Linda MacDonald | 10,000. |
| | Stephen M. Silling | 10,000. |
| | Michael A. Silling | 10,000. |
| | Elizabeth A. Sulzberger | 10,000. |
| | Rebecca C. Gilbert | 10,000. |

Sr.'s grandchildren should be made to refund their gifts, nor does he indicate any desire that he should refund the ten thousand dollar ($10,000.00) gift made to him. Instead, he accepts the document's validity to the extent it authorizes the gifts to him and his children, but attacks it insofar as it authorizes the gift to Erwin.

Although Defendant Erwin does not rely on the doctrine of equitable estoppel in support of her motion for summary judgment, the Court finds those principles applicable here. Where one having the right to accept or reject a transaction takes and retains benefits thereunder, he ratifies the transaction, is bound by it, and cannot avoid its obligation or effect by taking a position inconsistent with it. *See Baltimore and O. R.R. Co. v. Vanderwarker,* 19 W.Va. 265 (1882) (if one has enjoyed the benefit of a supersedeas bond, he is estopped to allege the bond was invalid); *Young v. Amoco Production Co.,* 610 F.Supp. 1479 (E.D.Tex. 1985), *aff'd,* 786 F.2d 1161 (5th Cir.1986) (one who accepts and retains benefits of a particular transaction will not thereafter be permitted to avoid its obligations or repudiate disadvantageous portions); *In re Naramore,* 3 B.R. 709 (D.C.N.Y.1980) (doctrine of equitable estoppel precluded defendant from voiding an oral agreement between two other parties from which the defendant derived the substantial benefit of $9,500.00); *United States v. Consolidated Edison Co. of N.Y., Inc.,* 452 F.Supp. 638 (S.D.N.Y.1977), *aff'd,* 580 F.2d 1122 (2d Cir.1978) (party cannot assert he has repudiated a contract while continuing to accept its benefits); *Thompson v. Soles,* 42 N.C.App. 462, 257 S.E.2d 59 (1979), *aff'd,* 299 N.C. 484, 263 S.E.2d 599 (1980) (party may not enjoy benefits of contract and at same time deny its terms or qualifications); *In re Washington Medical Center, Inc.,* 10 B.R. 616 (Bankr.D.Dist.Col. 1981) (where one accepts benefits of a contract, he will be estopped to deny the validity or binding effect of contract); *Smith v. Hornbuckle,* 140 Ga.App. 871, 232 S.E.2d 149 (1977); *Dolgow v. Anderson,* 45 F.R.D. 470 (E.D.N.Y.1968); *Johnson v. Johnson,* 262 N.C. 39, 136 S.E.2d 230, 234 (1964); *Smith v. Price Bros. Co.,* 131 F.2d 750 (6th Cir.1942), *cert. denied,* 318 U.S. 762, 63 S.Ct. 560, 87 L.Ed. 1134 (1943); *Berrier v. Sink,* 190 N.C. 620, 130 S.E. 714 (1925).

In Equity, courts proceed on the theory there is an implied condition that he who accepts a benefit under an instrument shall adopt the whole, conforming to all its provisions and renouncing every right inconsistent with it. *Wattie Wolfe Co. v. Superior Contractors, Inc.,* 417 P.2d 302 (Okla.1966); *see also Asberry v. United States Postal Service,* 692 F.2d 1378 (Fed.Cir.1982) (postal service employee, who voluntarily accepted settlement and its benefits, was equitably estopped to attack settlement); *Magenheim v. Board of Ed. of School Dist. of Riverview Gardens,* 347 S.W.2d 409, 419 (Mo.App.1961); *Simmons v. Clampitt Paper Co.,* 223 S.W.2d 792 (Tex.1949). In the quaint but appropriate language of Scotch law, "a man shall not be allowed ... to approbate and reprobate." *Rohanna v. Vazzana,* 196 Va. 549, 84 S.E.2d 440, 442 (1954).

> To Willard H. Erwin, Jr., with whom I have had a close business and personal relationship for more than forty years and who has always assisted me in many personal ways, the sum of 10,000.
>
> It is my request that the checks for my son and his children be accompanied with a suitable "holiday greeting card" and all mailed to him for delivery to the respective parties. The disbursement to Willard H. Erwin, Jr. may be delivered directly to him.
>
> I suggest this transaction be done as soon as possible and I do hereby so authorize these transactions this 5th day of November, 1992.
>
> HIS
> MARK [handwritten "x"]
> _____
> Cyrus E. Silling, Sr.

Witness to his mark:
[signature "Lisa M. Bailey"]
[signature "Martha H. Hess"]

Based upon the foregoing analysis,[16] the Court finds the principles of equitable estoppel prevent the Plaintiff from contesting the validity of the gift to Erwin.[17] Accordingly, the Court **GRANTS** Defendant Erwin's motion for summary judgment on this issue.

## IX.

## CHARGES FOR ACCOUNTING SERVICES

 Erwin performed a significant amount of accounting work for Silling, Sr. (Expert Report Roger A. Griffith). These services included the handling of investments, providing investment advice, preparing tax returns, preparing quarterly tax estimates, and other necessary services to accomplish the business affairs of Silling, Sr. *Id.* Erwin was also responsible for obtaining home health care providers, providing all tax information necessary for the payment of these employees, acting as the liaison between Silling, Sr. and United National Bank, and conducting daily phone calls and at least bi-weekly visits with Silling, Sr. regarding his investment portfolio. *Id.*

Jewel Carte, of United National Bank, testified she confirmed payment of these bills for Erwin's services with Silling, Sr. (Carte Dep. 74–75). Silling, Sr. ratified and approved the payments made to Erwin. In addition, for the 1990 tax year, Silling, Sr. deducted twenty-one thousand six hundred dollars ($21,600.00) in expenses for accounting bills submitted by Erwin. This is one of the allegedly unauthorized amounts Plaintiff

sets forth in Count III–C of his Second Amended Complaint.

Roger A. Griffith, in his expert report[18], verified the work actually performed by Erwin and has opined the work was reasonable and necessary. *Id.* In Griffith's opinion, the charges made by Erwin were approximately four times less than the going rate other certified public accounts would have charged for similar services at that time. *Id.*

Plaintiff offers no evidence to contradict the evidence offered by Defendant Erwin. Plaintiff simply argues, "Erwin apparently kept no time records. Plaintiff submits that a bill for eleven years of services submitted twelve years after the services were initially rendered, without any documentation to show the exact nature of the 'services' is highly suspicious." (Plaintiff's Response 19).

Defendant Erwin met her burden of initially showing the absence of a genuine issue concerning any material fact. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The burden then shifted to Plaintiff to "establish the existence of an element essential to [his] case and on which [he] will bear the burden of proof at trial." *See Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552. To discharge this burden, the Plaintiff cannot rely on his pleadings but instead must have evidence showing that there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. at 2553. The Plaintiff has not met his burden. The Court finds the uncontroverted evidence demonstrates the charges made to Erwin for accounting services were reasonable and necessary.[19] Accordingly, the Court

---

**16.** Additionally, Plaintiff's claim must fail because Erwin did not actually make the ten thousand dollar ($10,000.00) gift out of Silling, Sr.'s funds to himself as alleged in Count III–B of the Plaintiff's Second Amended Complaint. Similar to the contributions made on Silling, Sr.'s behalf to the Shriners Hospitals, the Bank, through Jewel Carte, issued payment. Carte independently verified with Silling, Sr. that he desired the requested contribution be made. Therefore, the allegations contained in the Count III–B of the Plaintiff's Second Amended Complaint must fail because Erwin did not "[make] a gift ... of $10,000.00 out of the funds of Cyrus E. Silling, Sr. to [himself]."

**17.** Notwithstanding the bar of estoppel, there is affirmative and direct evidence Silling, Sr. desired to make the gift to Erwin. Delores Canterbury, one of Silling, Sr.'s caretakers, testified Silling, Sr. specifically expressed his desire to make the ten thousand dollar ($10,000.00) gift to Erwin. (Canterbury Dep. 48–49). Moreover, when the request was made to United National Bank for payment, Jewel Carte called Silling, Sr. and specifically asked him to confirm his desire to make that gift, which he did. (Carte Dep. 99, 102, 132).

**18.** Mr. Griffith's expert report was disclosed pursuant to *Rule* 26(a)(2)(B) of the *Federal Rules of Civil Procedure.*

**19.** Similar to the contributions to charity and the *inter vivos* gift to Erwin, this aspect of the Plaintiff's claim must also fail because Erwin did not

GRANTS summary judgment to Defendant Erwin on this issue.

## CONCLUSION

Based upon the absence of any genuine issue of material fact and the law, the Court **GRANTS** summary judgment that: 1) Plaintiff is incompetent to testify regarding transactions or communications with his deceased father; 2) Silling, Sr. had the requisite mental capacity to execute the codicil dated April 13, 1991; 3) the April 13, 1991 codicil was executed properly; 4) Erwin did not exercise undue influence over Silling, Sr. regarding the April 13, 1991 codicil; 5) Plaintiff is estopped from contesting the validity of the April 13, 1991 codicil; 6) the thirty-five thousand dollars ($35,000.00) in contributions to Shriners Hospitals were authorized by Silling, Sr.; 7) Plaintiff lacks standing to assert a claim for fraudulent suppression of dividends; 8) Plaintiff is estopped from asserting Erwin improperly received a gift of ten thousand dollars ($10,000.00); and, 9) Plaintiff may not recover on a claim regarding charges to the Estate for accounting services performed by Erwin for Silling, Sr. during his lifetime.

Because no genuine issues of material fact remain, the Court **GRANTS** summary judgment on all remaining issues in favor of the Defendant Erwin. The Court **ORDERS** this case dismissed from the docket of the Court.

actually make the payments to himself out of the funds of Silling, Sr. as alleged in Count III–C of Plaintiff's Second Amended Complaint. Carte independently verified with Silling, Sr. that he desired the requested transaction take place and then issued payment. Therefore, the allegations contained in the Count III–C of the Plaintiff's Second Amended Complaint must fail because Erwin did not "[make] certain payments to himself for alleged accounting and management services out of the funds of Cyrus E. Silling, Sr."