JUSTICE COTTER
dissents.
¶22 I dissent. As requested by RBC, I would reverse the District Court’s order dissolving the TRO and remand this case for a determination of whether or not a preliminary injunction should issue to prevent Kramer from providing his services to others in violation of the agreement between Kramer and RBC.
¶23 I would conclude that the enforcement of the negative covenant in the contract between RBC and Kramer would not run afoul of § 27-19-103(5), MCA. The court properly recognizes that the exclusivity clause in the agreement, if enforced by way of an injunction, would prevent Kramer from performing for Clear Channel or any of Reier’s other competitors until the summer of 2004 when the Reier-Kramer agreement expires. I disagree, however, with the ensuing conclusion the Court reaches, which is that an injunction would amount to the indirect enforcement of the affirmative part of the contract because, if Kramer were to perform at all, he would have to perform for Reier. I respectfully submit that this is a stretch. RBC is not seeking to compel Kramer to perform under the contract. It is simply seeking to prevent *309 him from violating the non-competition provisions of the contract-provisions which were specifically bargained for by Kramer, at the encouragement and behest of MSU.
¶24 In addition, I find the position taken by MSU in this litigation offensive. As the majority notes, RBC and Kramer entered into an employment contract “at the behest of MSU.” RBC alleges, and MSU does not deny, that representatives of MSU approached RBC for purposes of securing additional compensation for Kramer, after Kramer had been hired by MSU. An agreement was reached whereby Kramer would receive $10,200 from RBC, and in exchange would broadcast with RBC and no one else. MSU actively sought this benefit for Kramer and approved of the terms of the contract. A little more than a year later, MSU decided to award the exclusive rights to broadcast its athletic events to RBC’s competitor, Clear Channel Communications. It was only at this point-when the deal between RBC and Kramer ceased serving MSU’s interests-that MSU began to cry foul, claiming that the contract which it solicited in the first place, should be declared unenforceable. Laid bare, theirs is an argument bom of convenience, not virtue.
¶25 RBC has fully and in good faith performed its obligations under its contract with Kramer, and for the first year, MSU and Kramer both accepted the benefits of the contract as well. Now, they want this Court to assist them in their breach. Many years ago this Court recognized that “[a] party who has secured to himself the benefits of a contract, and has accepted and used these benefits, has estopped himself in the courts from denying the validity or binding force of the instrument, or from setting up or asserting the contrary.” Brundy v. Canby (1915), 50 Mont. 454,148 P. 315 (citations omitted). Numerous other courts have embraced this same legal premise: Once a contract is performed and a party has received the benefits of it, that party is estopped from claiming invalidity in order to avoid the contract’s burdens. See Seay v. Dodge (N.D. Ill. 1998), 1998 U.S. Dist. LEXIS 12005; 1998 WL 460273; Silling v. Erwin (S.D.W.Va. 1995), 885 F.Supp. 881; Smith v. Hornbuckle (Ga. 1977), 232 S.E.2d 149.
¶26 Although the resolution I favor as set out in ¶ 23 could stand alone, I would also conclude that MSU and Kramer were estopped from challenging the contract’s enforceability. For these reasons, I dissent.
JUSTICE RICE concurs in the foregoing dissent.